THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE, *v.* HUTTON, APPELLEE AND CROSS-APPELLANT.

[Cite as State *v.* Hutton (1990), 53 Ohio St. 3d 36.]

(No. 88-1074—Submitted February 6, 1990—Decided August 8, 1990.)

*John T. Corrigan,* prosecuting attorney, and *George J. Sadd,* for appellant and cross-appellee.

*Floyd B. Oliver* and *David L. Doughten,* for appellee and cross-appellant.

MOYER, C.J. The state advances seven propositions of law in support of its appeal. Hutton, cross-appealing certain aspects of the court of appeals' decision, asserts seven propositions of his own. For the reasons that follow, we reverse the judgment of the court of appeals and remand to that court for further proceedings.

## I

The court of appeals held that Eileen Sweeney's testimony that Hutton raped her was inadmissible under R.C. 2945.59, the substantial equivalent, in relevant part, of Evid. R. 404(B). In its first proposition of law, the state contends that this holding was erroneous.

First, the state contends that evidence of the rape was admissible as evidence of Hutton's "scheme, plan, or system" under Evid. R. 404(B). "Scheme, plan, or system" evidence is relevant where it tends to prove the offender's identity or where "* * * the 'other acts' form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment. * * * To be admissible pursuant to this subcategory of 'scheme, plan, or system' evidence, the 'other acts' testimony must concern events which are inex-

tricably related to the alleged criminal act. * * *" *State* v. *Curry* (1975), 43 Ohio St. 2d 66, 73, 72 O.O. 2d 37, 41, 330 N.E. 2d 720, 725.

The state suggests that the testimony "tended to establish identity of the criminal * * *." However, the rape, as distinct from what Hutton said during the rape, was clearly irrelevant to the identity of Mitchell's killer. We recently held that: "* * * 'Other acts' may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense. * * *" *State* v. *Smith* (1990), 49 Ohio St. 3d 137, 141, 551 N.E. 2d 190, 194. See, also, *State* v. *Broom* (1988), 40 Ohio St. 3d 277, 282, 533 N.E. 2d 682, 690. Evidence of the rape, under the facts here, did not constitute the type of *modus operandi* evidence that would tend to prove the identity of Mitchell's murderer.

The state further argues that the rape is "inextricably related" to the murder. But it seems clear that the rape was not part of the "immediate background" of the murder. It was not part of "the same transaction as the act that * * * [was] the object of proof." 1 Weissenberger, Ohio Evidence (1985), Section 404.28.

The state's third argument is that the rape establishes additional motive for the murder. The state theorizes that Hutton murdered Mitchell and raped Sweeney for the same reason: because he wanted "to take Mitchell's place in Ms. Sweeney's life." However, the state presented no such theory to the jury. The state's consistent theme in closing argument was that Hutton wanted revenge on Mitchell and Simmons because they had stolen from him.

Fourth, the state argues that the story of the rape was admissible to explain why Sweeney would accompany Hutton for an unspecified period even though she had reason to believe that Hutton had harmed Mitchell. The state's answer to that question, quoting from Judge Patton's dissent below, is that Hutton "detained her against her will from the time she reentered * * * [Hutton's] car at the hospital until she was released at LaWanda Mitchell's house. * * *"

But the record is to the contrary. Sweeney testified that she entered Hutton's car at the hospital because Hutton "told * * * [her] that Ricky was at home and he [Hutton] would take * * * [her] there." There is no indication whatever in the record that Hutton forced her to go with him. It is understandable that the state would want to explain why, after what Simmons said, Sweeney would get into a car with Hutton. But the rape, which occurred later, simply does not explain it.

Finally, one possible theory of admissibility is not discussed in the state's brief, but was argued at trial. The prosecutor suggested that Hutton raped Sweeney to "terrorize" her into silence about what he had done to Mitchell. On this theory, the rape, like any other attempt to intimidate a witness, would be admissible to show consciousness of guilt.

However, Hutton did not tell Sweeney that "Ricky wasn't coming back" before he raped her; instead, he told her this during the rape. The rape could hardly have been motivated by Hutton's desire to keep Sweeney from repeating information that he had not yet given her.

Since the rape was neither "inextricably intertwined" with the murder, nor relevant for any purpose, it was inadmissible under Evid. R. 404(B). But this conclusion does not end our in-

quiry. If the other admissible evidence, standing alone, constitutes overwhelming proof of guilt, the error is harmless. *State* v. *Zuern* (1987), 32 Ohio St. 3d 56, 60-61, 512 N.E. 2d 585, 590; *State* v. *Williams* (1983), 6 Ohio St. 3d 281, 6 OBR 345, 452 N.E. 2d 1323, paragraph six of the syllabus.

The evidence in this case points ineluctably to Hutton as the murderer of Derek Mitchell. Hutton had a strong motive: revenge for the theft of the sewing machine and the money hidden therein. Hutton claimed to have been told by Evans that Mitchell had tried to sell Evans a sewing machine. Hutton accused Mitchell of "breaking in my sister's house." In response to Hutton's demands, Mitchell actually produced a sewing machine, which he turned over to Hutton. Finally, Hutton carried out his threat to shoot Simmons. On this record, it is clear that Hutton believed that Mitchell and Simmons stole his machine.

Hutton attempted to kill Simmons with a .22 caliber revolver. He also had a .22 caliber rifle in his car. Mitchell was killed with a .22 caliber weapon. Expert testimony established that Simmons could have been shot with the same gun. Eileen Sweeney corroborated Simmons's description of Hutton's pistol. Mitchell's corpse was found with a tire lying on it — a significant fact in light of the evidence that Hutton believed that Mitchell had stolen tires from him.

Hutton told Eileen Sweeney that "Ricky wasn't coming back," and she should "forget about him." These statements clearly show that Hutton knew Mitchell was dead. He later informed her that "if * * * [she] told[,] someone would be looking for * * * [her]." This threat indicates consciousness of guilt.

Events confirmed Hutton's statement that Mitchell "wasn't coming back." Eileen Sweeney, Mitchell's alleged common-law wife, never saw Mitchell again after he left her at the hospital. This was unusual, since Sweeney testified that, during their three-year cohabitation, Mitchell "[v]ery seldom" failed to spend the night at their apartment and never left home without telling her.

The evidence that the murder was committed with prior calculation and design is, if anything, stronger. Mitchell was shot at least twice, once in the head and once in the chest. See *State* v. *Clark* (1988), 38 Ohio St. 3d 252, 256, 527 N.E. 2d 844, 850. When this is added to Hutton's repeated threats against Mitchell's life, a rational trier of fact could hardly fail to find prior calculation and design.

Finally, the evidence of kidnapping was overwhelming. Simmons's testimony showed that Hutton shot Simmons and falsely told Mitchell that someone else had done it. At the hospital, Mitchell said, in Hutton's presence, "* * * [W]e going to get the * * * [person] that did this to you." While there is no evidence that Hutton affirmatively caused Mitchell to believe that they were about to hunt down Simmons's fictitious assailant, Hutton knew that Mitchell believed they were. Instead of correcting this belief, Hutton took advantage of it to lead Mitchell to his death. This constituted kidnapping by deception under R.C. 2905.01(A). See *State* v. *Amell* (1987), 303 Ore. 355, 736 P. 2d 561; *State* v. *Dalton* (App. 1980), 98 Wis. 2d 725, 298 N.W. 2d 398, 16 A.L.R. 4th 654. The state's first proposition of law is sustained.

II

The state's second and fifth propositions of law are concerned with the role of the presentence investigation report in the penalty phase of a capital case.

After Hutton's conviction, his trial counsel requested a presentence investigation ("PSI") pursuant to R.C. 2929.03(D)(1). The resulting report listed Hutton's criminal charges since 1967 and indicated the disposition of each charge. Two of the listed charges resulted in delinquency adjudications and five resulted in criminal convictions. One other charge resulted in probation. Six charges were listed as "Released" or "No disposition." The charges on which Hutton had just been tried were listed as "Pending." A pending rape case against Hutton was also listed.

A majority of the court of appeals agreed that Hutton's counsel had been ineffective. Judge Matia, in a part of the majority opinion not joined by any other judge, considered the mere request for a PSI to be ineffective assistance, because it brought Hutton's criminal record before the jury. Judge McManamon concurred on narrower grounds. She thought it acceptable for counsel to request a PSI, but believed that the criminal charges not resulting in convictions or delinquency adjudications were irrelevant and highly prejudicial. She concluded that Hutton's counsel was ineffective because he did not seek to have the assertedly irrelevant material stricken from the report. See *State* v. *Glenn* (1986), 28 Ohio St. 3d 451, 459-460, 28 OBR 501, 508, 504 N.E. 2d 701, 710.

### A

The state's second proposition of law asserts that the court of appeals erred by holding that Hutton's counsel rendered ineffective assistance in the sentencing phase.

Allegations of ineffective assistance of counsel are considered in two parts. First, the reviewing court must determine whether the challenged act or omission fell below an objective standard of reasonableness. Second, it must decide whether the defendant was prejudiced. To prevail, the defendant must show that there is a reasonable probability that, but for counsel's errors, the result would have been different. *Strickland* v. *Washington* (1984), 466 U.S. 668.

We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Id.* at 689. Especially on direct appeal, that presumption is not easily overcome. The record does not show counsel's thought processes, nor does it show a failure to "make reasonable investigations * * *." *Id.* at 691.

It may be, for instance, that counsel conducted a diligent investigation, but was simply unable to find substantial mitigating evidence. In such circumstances, an attorney might logically decide to take the chance that a PSI may produce something he had missed, even at the risk of disclosing his client's criminal record. Since the record does not rebut the presumption that counsel performed reasonably, we cannot hold that counsel's mere request for a PSI was ineffective assistance.

### B

The court of appeals concluded that defense counsel should have had Hutton's arrest record excised from the PSI because the General Assembly intended that arrests not leading to criminal convictions or delinquency adjudications not come before the jury in a capital case. R.C. 2929.04(B)(5) specifically lists as a mitigating factor the lack of a significant history of convictions and delinquency adjudications. Since convictions and delinquency adjudications are specifically mentioned in R.C. 2929.04, while arrests are not, the majority concluded that arrests are not relevant to capital sentencing.

However, the statute requires that a PSI be made if the defendant requests it "pursuant to section 2947.06 of the Revised Code. * * *" R.C. 2929.03(D)(1). Neither R.C. 2929.03 nor 2947.06 states what information shall be included in the PSI. Had the General Assembly wished to exclude arrests from the PSI, it could have said so. We conclude that the statute leaves the matter in the sound discretion of the trial judge, as governed by the Rules of Criminal Procedure.

Crim. R. 32.2(B) requires that the report "shall state the defendant's prior criminal record * * *" as well as "such information about defendant's social history * * * as may be helpful in imposing or modifying sentence * * *."

We recently held that the concept of "social history" is broad enough to include allegations of wrongdoing even though the wrongdoing did not result in criminal charges. *State* v. *Cooey* (1989), 46 Ohio St. 3d 20, 35, 544 N.E. 2d 895, 914. Surely the arrests reported in Hutton's PSI were at least as much a part of his social history as the allegations involved in *Cooey*. As arrests, they are part of his "prior criminal record" as well.

A presentence investigation report in a capital case may include the defendant's arrest record. It follows that counsel's failure to seek its exclusion was not professionally unreasonable. We sustain the state's second proposition of law.

C

The state's fifth proposition of law argues that the prosecutor did not commit misconduct in his penalty phase closing argument when he discussed Hutton's arrest record.

The prosecutor devoted a large part of his argument to Hutton's criminal record as it appeared in the PSI. He read each item to the jury.

Discussing the first two charges on Hutton's record, he said, "Both times he was released. Caught a couple of breaks." Discussing another charge, he said: "Again he gets a release * * *. How many times do they have to pat this guy on the back?"

The prosecutor also said:

"He is found guilty in '78 of voluntary manslaughter, felonious assault, weapons disability and abduction. Sentenced again. * * * He appeals the conviction and everything except for the weapons disability charge is reversed by the Court of Appeals and there is no further prosecution. He gets paroled again."

The court of appeals thought it impermissible for the prosecutor to discuss "charged offenses which did not result in convictions * * *." But if the offenses were properly included in the PSI, the prosecutor had a right to discuss them, for "once lawfully inserted into the sentencing considerations, such information is subject to fair comment by both parties." *State* v. *Greer* (1988), 39 Ohio St. 3d 236, 253, 530 N.E. 2d 382, 402.

However, there was no evidence in the PSI or elsewhere in the record that the previous convictions had been reversed on appeal. An attorney may not allude in argument to matters outside the scope of the evidence. *State* v. *Smith* (1984), 14 Ohio St. 3d 13, 14 OBR 317, 470 N.E. 2d 883. Thus, as the court of appeals held, the prosecutor erred in telling the jury that the prior convictions had been reversed.

The defense did not object to the prosecutor's improper remarks. The state, while not specifically addressing the references to the previous reversal, contends that none of the remarks made by the prosecutor during this argument, however improper they may have been, constituted plain error. When error is not objected to at

trial, a reviewing court may take notice of it if it constitutes plain error. Plain error analysis looks to whether "* * * but for the error, the outcome of the trial clearly would have been otherwise." *State* v. *Long* (1978), 53 Ohio St. 2d 91, 7 O.O. 3d 178, 372 N.E. 2d 804, paragraph two of the syllabus. "Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

By emphasizing the "breaks" Hutton received, the prosecutor apparently sought to suggest that Hutton had committed crimes and gotten away with them. Such argument could have distracted the jury from its proper task: deciding what punishment Hutton deserved for murdering Mitchell. After hearing about the crimes Hutton had supposedly gotten away with, the jury may have wanted to punish him for those crimes as well. Thus, the prosecutor's statement was potentially prejudicial.

On the other hand, the evidence in mitigation was meager, consisting mainly of Hutton's protestations of innocence. The PSI also mentioned that Hutton's father had died and that his stepfather abandoned his family when Hutton was a child.

Given the sparseness of the mitigating evidence, we cannot say that it is *clear* that the outcome of the penalty phase would have been different but for the unobjected-to statements. The state's fifth proposition of law is therefore sustained.

### III

The various opinions in the court of appeals seem to have confused the parties as to the precise grounds upon which the court of appeals reversed the trial court's judgment. Judge Matia's opinion reached conclusions adverse to the state on six issues, three of which we have already discussed. However, Judge McManamon specifically disagreed with Judge Matia on the three remaining issues, which correspond to the state's third, fourth, and sixth propositions of law in this court. Thus, the lead opinion's discussion of those issues represented only the views of its author.

Because the state prevailed on these issues in the court of appeals, and Hutton did not cross-appeal on them, they are not properly before us. Since we conclude that the majority of the court of appeals decided them correctly in the state's favor, they would not affect our disposition of this appeal in any event.

### IV

In Hutton's sixth proposition of law on cross-appeal, he argues that the trial court erred by removing a juror, between the guilt and penalty phases, and replacing her with an alternate.

On January 29, 1986, the jury convicted Hutton of the charges against him. As the jurors left the courtroom, the trial judge noticed that juror Pemberton was "crying and seemingly overwrought * * *." The judge thereupon conferred in chambers with Pemberton and the attorneys for both parties.

Pemberton "indicated * * * that there were a number of things that bothered her and suddenly seemed to overwhelm her." She mentioned that "a minor child was ill at home and needed her attention," that she was not receiving her regular salary while on jury duty, that continued service would cause her to miss a planned vacation, "and some other matters all of a personal nature." She was "visibly * * * and violently shaking, and in the Court's lay opinion she was highly upset." The court, over defense objection, replaced Pemberton with an

alternate juror and sent Pemberton home. The alternate sat through the penalty phase and participated in all subsequent deliberations.

First, Hutton argues that the trial court excused Pemberton without adequate cause. One of the trial court's reasons for excusing Pemberton was that she had a sick child at home. "[T]he discharge of an individual juror for illness of an immediate member of his family during any stage of a criminal trial is within the sound discretion of the trial court * * *." *State* v. *Sallee* (1966), 8 Ohio App. 2d 9, 11, 37 O.O. 2d 5, 6, 220 N.E. 2d 370, 371.

Moreover, her son's illness and the other circumstances upset Pemberton so badly that she was crying and "violently shaking. * * *" Crim. R. 24(F) allows the court to replace jurors who "* * * become or are found to be unable or disqualified to perform their duties. * * *" See *State* v. *Shields* (1984), 15 Ohio App. 3d 112, 119, 15 OBR 202, 210, 472 N.E. 2d 1110, 1118; *State* v. *Hopkins* (1985), 27 Ohio App. 3d 196, 27 OBR 235, 500 N.E. 2d 323. We do not find that, in excusing Pemberton, the trial court abused its discretion. See *State* v. *Greer, supra,* at 248, 530 N.E. 2d at 397 (juror who during voir dire exhibited "considerable emotional difficulty" with recommending death penalty was "unsuitable" to serve as a juror).

Second, Hutton argues that, when a trial court replaces a juror with an alternate after the guilt phase but before the penalty phase, the defendant is denied his statutory right to have the penalty recommendation made by "the trial jury" as required by R.C. 2929.03(C)(2)(b) and (D)(2).

We have held that "the decisions leading to a death sentence must be made by the same jury that convicted the offender in the guilt phase. * * *" *State* v. *Penix* (1987), 32 Ohio St. 3d 369, 373, 513 N.E. 2d 744, 748. Hutton maintains that, where the twelve jurors voting on a penalty are not the same twelve who voted on guilt, the penalty decision has not been made by "the same jury that convicted the offender * * *." However, R.C. 2929.03 speaks of "the trial jury * * *." We hold that the "trial jury" consists of all the jurors, including any properly substituted alternates.

Our interpretation is consistent with the reasons for using "the trial jury" to recommend the sentence. In *Lockhart* v. *McCree* (1986), 476 U.S. 162, the United States Supreme Court, holding that using the same jury in both phases is constitutional, identified two legitimate state interests in that practice. First, a capital defendant "might benefit at the sentencing phase * * * from the jury's 'residual doubts' about the evidence presented at the guilt phase. * * *" *Id.* at 181. Second, "in most, if not all, capital cases much of the evidence adduced at the guilt phase of the trial will also have a bearing on the penalty phase * * *." *Id.*

Alternate jurors are selected in the same way as regular jurors and hear the same evidence. Since they see and hear the trial, they are as capable as regular jurors of considering the evidence admitted in the guilt phase, and quite as likely to entertain "residual doubts" and weigh them in the defendant's favor. By contrast, in *Penix, supra,* after the court of appeals had vacated the death penalty, the state sought a new penalty hearing with entirely new jurors who had played no part in the guilt phase. The evidence presented at the guilt phase would necessarily have to be presented again. "* * * Such repetitive trials could not be consistently fair to the State and perhaps not even to the accused." *Rector* v. *State* (1983), 280 Ark. 385, 396, 659 S.W. 2d 168, 173.

This, for us, suffices to distinguish *Penix.*

Finally, Hutton argues that the trial court should have discharged the alternates as soon as the jury retired to consider guilt or innocence, as required by Crim. R. 24(F).

Crim. R. 24(F) provides:

"* * * Alternate jurors * * * shall replace jurors who, prior to the time the jury *retires to consider its verdict,* become or are found to be unable or disqualified to perform their duties. * * * An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. * * *" (Emphasis added.)

Crim. R. 24(F) reflects the general rule that, after the jury retires to deliberate, alternates may not replace regular jurors. See, *e.g., State* v. *Locklear* (1978), 61 Ohio App. 2d 231, 15 O.O. 3d 369, 401 N.E. 2d 457; *United States* v. *Lamb* (C.A.9, 1975), 529 F. 2d 1153; *People* v. *Burnette* (Colo. 1989), 775 P. 2d 583; *People* v. *Ryan* (1966), 19 N.Y. 2d 100, 224 N.E. 2d 710.

However, few cases have considered how this general rule applies to the unique context of a bifurcated trial. One such case is *State* v. *Dodis* (Minn. 1982), 314 N.W. 2d 233. In *Dodis,* a murder defendant raised the defense of mental illness. Under Minnesota law, his trial was bifurcated into a guilt phase and a mental illness phase. Between phases, an alternate replaced a regular juror.

This procedure was upheld because "there were, in effect, two separate trials on two distinct issues. * * *" *Dodis, supra,* at 241. The alternate's absence from deliberations on guilt was "of no consequence" to his ability to deliberate on mental illness, because "the finding of proof of the elements of the crime is an accepted fact, not to be attacked collaterally. * * *" *Id.* See, also, *Shreeves* v. *United States* (D.C. App. 1978), 395 A. 2d 774, overruled in part on other grounds, *Dew* v. *United States* (D.C. App. 1989), 558 A. 2d 1112, 1116, fn. 3.

The court of appeals applied similar logic here, reasoning that the substitution was proper because "[i]n a capital case, there are two separate trials. * * *" (Emphasis omitted.) Such reasoning does not, however, fully apply to a capital case. The issues of guilt and penalty are not wholly "distinct," as were the issues in *Dodis, supra;* rather, they are necessarily "interwoven." *Rector, supra,* at 395, 659 S.W. 2d at 173. Moreover, the capital defendant may attack the finding of guilt during the penalty phase. See, *e.g., State* v. *Gillard* (1988), 40 Ohio St. 3d 226, 234-235, 533 N.E. 2d 272, 281; *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 142, 22 OBR 203, 218-219, 489 N.E. 2d 795, 811.

This was recognized in *People* v. *Fields* (1984), 35 Cal. 3d 329, 197 Cal. Rptr. 803, 673 P. 2d 680. The defendant there argued that it was unconstitutional to remove prospective jurors who would automatically vote against the death penalty, but could still impartially decide guilt. He proposed that such jurors sit on the jury in the guilt phase and yield to alternate jurors for the penalty phase.

Rejecting this approach, the *Fields* court noted that an alternate who joined the jury for the penalty phase "* * * would be joining a group which has already discussed and evaluated the circumstances of the crime, the capacity of the defendant, and other issues which bear both on guilt and on penalty * * * and may have arrived at tentative conclusions * * *." *Id.* at 351, 197 Cal. Rptr. at 817, 673 P. 2d at 693. An alternate would be "ignorant of those discussions and conclusions,"

*id.,* and might find it difficult to affect the thinking of the others. His situation would be similar to that of an alternate who joined the jury in the midst of its deliberations on guilt.

On the other hand, although the issues determined in the guilt phase overlap with those determined in the penalty phase, they are ultimately different issues. In the guilt phase, the jury's essential task is to make determinations of fact and apply the law to the facts it finds. In the penalty phase, the jury is asked to make "a moral inquiry into the culpability of the defendant * * *." *California* v. *Brown* (1987), 479 U.S. 538, 545 (O'Connor, J., concurring).

In making that moral inquiry, the jury hears evidence and arguments that it would not have been permitted to hear in the guilt phase. Here, for instance, a PSI was admitted. The information it contained would have been largely irrelevant to the question of guilt or innocence. As we observed earlier this term:

"* * * Although the issue of guilt or innocence is relevant to sentencing * * *, it is not the only issue in the penalty phase, as it is in the guilt phase. * * * [A] defendant can avoid the death penalty even though the trier of fact does not doubt his guilt at all." *State* v. *Tyler* (1990), 50 Ohio St. 3d 24, 40, 553 N.E. 2d 576, 594-595. With regard to the evidence and arguments adduced in the penalty phase, an alternate juror who was present throughout the trial and during the whole of the penalty deliberations would be able to take as full and productive a part in those deliberations as any of the original jurors. The substitution "does not change the character of the jury. * * *" *People* v. *Green* (1971), 15 Cal. App. 3d 524, 528, 93 Cal. Rptr. 84, 86. Thus, the *Fields* court "recognize[d] that unforeseen cir-

cumstances may require substitution of a juror at the penalty phase of a capital trial, even though the alternate did not take part in the guilt phase deliberations. * * *" *Fields, supra,* at 351, 197 Cal. Rptr. at 817, 673 P. 2d at 693, fn. 9, citing *Green, supra.*

Another factor that persuades us that Crim. R. 24(F) was not meant for this situation is that the consequences of its application would be decidedly more severe than when it is applied in the guilt phase. If a juror becomes ill or is otherwise disqualified after the jury has begun its deliberations on guilt or innocence, a mistrial results; the state, however, may then retry the defendant. *Pfeffer* v. *State* (Tex. App. 1984), 683 S.W. 2d 64; *People* v. *Loving* (1977), 67 Cal. App. 3d Supp. 12, 136 Cal. Rptr. 851. But if the juror is excused after the verdict but before the jury begins to deliberate on the sentence, the case would be over. The deliberations could not go forward without a full complement of twelve jurors. Nor could the court impanel a new jury of twelve, since no defendant can be sentenced to death on the recommendation of a jury other than the trial jury. *Penix, supra.* Thus, to adopt Hutton's view would completely foreclose the state from obtaining the death penalty.

It has been suggested that, if alternates were allowed to replace regular jurors after the jury retired to deliberate, jurors in the minority might fake illness in order to be replaced and thereby escape the emotional pressures of holding out against the majority. See *Lamb, supra,* at 1156. Hutton attempts to apply that reasoning to the situation in this case. He suggests that Pemberton may simply have wanted to avoid the difficult choice between life and death that would have faced her in the penalty phase. However, we agree with those commen-

tators who consider the possibility of malingering unduly speculative, see Note (1981), 57 Notre Dame L. Rev. 137, 148; unrealistic, see Comment (1982), 31 Am. U. L. Rev. 651, 670-671; and inconsistent with the familiar presumption that jurors obey the court's instructions, *id.*

Crim. R. 24(F) is not violated in a capital case where an alternate juror is substituted for another juror after the guilt phase verdict, but before deliberations begin in the penalty phase. Accordingly, Hutton's sixth proposition of law on cross-appeal is overruled.

## V

In his third proposition of law on cross-appeal, Hutton argues that he was prejudiced by gruesome photographs of Derek Mitchell's rotting corpse. The photographs at issue are State's Exhibits 16 to 19, which show Mitchell's body in the coroner's office, and 26 to 34, which show where the body was found.

We note that Exhibits 32 to 34 do not show "actual bodies or body parts[,]" *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 281, 528 N.E. 2d 542, 550, and having examined them, we cannot accept Hutton's characterization of them as "gruesome."

The remaining photographs are indeed macabre. They are also probative. The extreme decomposition of the body explained why the coroner could not fix the time of death and why he could not find an entry wound for the bullet located in Mitchell's chest. See *State* v. *Benner* (1988), 40 Ohio St. 3d 301, 311, 533 N.E. 2d 701, 712-713, fn. 3. State's Exhibit 31, which shows the skin sloughing off Mitchell's left foot, also shows that he had no shoe on that foot. This helped to identify the body as Mitchell's because a left shoe was found in the same area as the body and Mitchell's sister and wife both identified it as Mitchell's shoe.

State's Exhibits 28 and 29 show the tire on the body. The tire tends to show that Hutton was the killer. As the prosecution noted at trial, Hutton had accused Mitchell of stealing tires from Hutton's back yard. The prosecutor, with these words, suggested that Hutton placed the tire on the body as an ironic gesture: "What was laying [*sic*] on top of Ricky Mitchell? A tire. * * * You want some tires, sucker, well here is one for you. * * *" We find that the probative value of the photographs outweighs the potential they present for prejudice.

Although the photographs were probative, they were also unnecessarily repetitious. For instance, State's Exhibits 17, 18, and 19 simply depict the same subject from different angles.

However, only eight gruesome photographs were used, of which only four were arguably repetitious. Moreover, challenged relevant evidence "should be viewed in a light most favorable to the proponent * * *, maximizing its probative value and minimizing any prejudicial effect * * *." *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 265, 15 OBR 379, 402, 473 N.E. 2d 768, 792. Given the unquestionable probative value of the photographs, and the minimal number used, we find the repetition harmless. Thus, Hutton's third proposition of law is overruled.

## VI

In his seventh proposition of law, Hutton argues that his trial counsel was ineffective in four ways.

First, he complains that his counsel failed to investigate possible mitigating evidence. As we observed, however, the record does not show what investigations counsel did or did not make. Since it is Hutton's burden

to show that his counsel's performance was deficient, his claim lacks merit.

Moreover, Hutton relies on the testimony his lawyer introduced in the guilt phase to show that potential mitigating evidence existed. He asserts that there had been testimony as to his good reputation, his intelligence, and "the fact that he was attending school in Indianapolis in order to improve his auto repair business." But the introduction of that testimony suggests that Hutton's lawyer did investigate the matters testified to. And since the jury had heard the testimony in the guilt phase, we think it a plainly reasonable exercise of professional judgment not to repeat the same testimony in the penalty phase.

Second, Hutton complains that his lawyer failed to object to the firearm specification's inclusion in the indictment and its submission to the jury during the guilt phase. However, the jury was not instructed that the firearm specification was an aggravating circumstance. Cf. *State* v. *Johnson* (1986), 24 Ohio St. 3d 87, 24 OBR 282, 494 N.E. 2d 1061.

Third, Hutton complains that his lawyer did not object to the prosecutor's reading his juvenile record to the jury. However, the record was part of the PSI, and therefore subject to fair comment by the prosecutor. Merely reading excerpts from the PSI to the jury was not objectionable.

Finally, Hutton's lawyer did not object to the trial court's statement that the jury would "recommend" a sentence. This, of course, was a completely correct statement of law, as we reaffirm *infra*, and was in no way objectionable.

Since we find no merit in any of Hutton's claims of ineffective assistance, his seventh proposition of law is overruled.

## VII

In Hutton's first proposition of law on cross-appeal, he sets forth nine reasons the Ohio statutes governing the death penalty are unconstitutional. We have rejected each of his arguments. See *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 167-179, 15 OBR 311, 314-324, 473 N.E. 2d 264, 272-281, and paragraphs two and eight of the syllabus; *State* v. *Mapes* (1985), 19 Ohio St. 3d 108, 117, 19 OBR 318, 325, 484 N.E. 2d 140, 148; *State* v. *Scott* (1986), 26 Ohio St. 3d 92, 109, 26 OBR 79, 93-94, 497 N.E. 2d 55, 69; *State* v. *Zuern, supra,* at 63-64, 512 N.E. 2d at 592-593. This proposition of law is summarily overruled. *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E. 2d 568.

In his fourth proposition of law, Hutton complains that the trial court instructed the jury in the penalty phase as follows: "You must not be influenced by any consideration of sympathy or prejudice." The instruction of which this language was a part was approved in *Jenkins, supra,* at 191-192, 15 OBR at 334-335, 473 N.E. 2d at 290-291. See, also, *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 125, 31 OBR 273, 285, 509 N.E. 2d 383, 396. More important, the instruction was not even given in the penalty phase. Contrary to Hutton's contention, it was given only in the guilt phase, where it was incontestably proper. Accordingly, this proposition of law is overruled.

In Hutton's fifth proposition of law on cross-appeal, he argues that it was unconstitutional to instruct the jury that a decision to impose the death penalty was a mere recommendation, while a decision to impose a life sentence would be binding. Having repeatedly rejected this argument, see, e.g., *State* v. *Hicks* (1989), 43 Ohio St. 3d 72, 79-80, 538 N.E. 2d 1030,

1038-1039, we summarily overrule this proposition of law.

## VIII

In its seventh proposition of law, the state argues that the court of appeals erred by not engaging in independent review of the sentence as required by R.C. 2929.05(A).

The court of appeals reserved judgment on the proportionality and appropriateness of the death sentence because, if its judgment were affirmed, a new trial would be required. That would leave the trial court "* * * in the uncomfortable position of trying a case calling for possible capital punishment wherein an appellate court had in fact *** found that the imposition of capital punishment was warranted."

The state observes that R.C. 2929.05(A) requires reviewing courts to "review the sentence of death *at the same time* that they review the other issues in the case. * * *" (Emphasis added.) According to the state, we should now conduct our own independent review instead of remanding to the court of appeals.

However, to do as the state suggests would deny Hutton his statutory "right to independent review by both the intermediate appellate court and the Supreme Court." *Gillard, supra,* at 235, 533 N.E. 2d at 281; R.C. 2929.05(A). This safeguard "eliminates the arbitrary imposition of the death penalty. * * *" *Glenn, supra,* at 453, 28 OBR at 502, 504 N.E. 2d at 705, quoted in *Gillard, supra.* Therefore, in reversing the judgment of the court of appeals, we must remand this cause to that court for its independent review.

In Hutton's second proposition of law, he argues that the sentence of death is disproportionate to the sentences imposed in similar cases. Again, we decline to pass on this issue until the court of appeals has completed its review.

The judgment of the court of appeals is reversed. This cause is remanded to the court of appeals for independent review of the sentence. On remand, the court of appeals must weigh the aggravating circumstances as well as the mitigating factors, and determine, as required by R.C. 2929.05(A), whether the aggravating circumstances outweigh the mitigating factors and whether the sentence of death is the appropriate sentence in this case.

*Judgment reversed and cause remanded.*

DOUGLAS and RESNICK, JJ., concur.

HOLMES, J., concurs in the syllabus and judgment only.

SWEENEY, WRIGHT and H. BROWN, JJ., concur in part and dissent in part.

H. BROWN, J., concurring in part and dissenting in part. I concur in the syllabus law, and in the majority's holding that the defendant Hutton was properly convicted. However, because the sentencing phase of the trial was marred by a plain error in the jury instructions, I must respectfully dissent from the remand for review of the death sentence.

A criminal defendant has a right to expect that the trial court will give complete and correct jury instructions. *State* v. *Williford* (1990), 49 Ohio St. 3d 247, 251, 551 N.E. 2d 1279, 1283. The trial court's instructions to the

jury[2] correctly explained that the jury was required to weigh the aggravating circumstances against the mitigating factors, and could impose a sentence of death only if the aggravating circumstances outweighed the mitigating factors. Unfortunately, the court failed to tell the jury what the "aggravating circumstances" were.

Though defendant's counsel did not object at trial and the issue has not been raised on appeal, this omission is plain error. No jury (or anyone else) can weigh aggravating circumstances against mitigating factors without knowing what the aggravating circumstances are. This weighing process is the very purpose of the sentencing phase of a capital trial. Without any instruction defining "aggravating circumstances," the jury was left "with untrammeled discretion to impose or withhold the death penalty." *Gregg* v. *Georgia* (1976), 428 U.S. 153, 196, at fn. 47. This, the United States Constitution forbids.

Accordingly, I would reverse the sentence of death and remand for imposition of a life sentence pursuant to *State* v. *Penix* (1987), 32 Ohio St. 3d 369, 513 N.E. 2d 744.

SWEENEY and WRIGHT, JJ., concur in the foregoing opinion.

---

[2] The full text of the jury instructions is as follows:

"THE COURT: Ladies and gentlemen, you have now heard all the evidence and the arguments of counsel, and you will now decide whether you will recommend to the Court that the sentence of death shall be imposed upon the Defendant, and if not whether you will recommend that the Defendant be sentenced to life imprisonment with a parole eligibility after serving 20 full years of imprisonment, or to life imprisonment with parole eligibility after serving 30 full years of imprisonment.

"You will consider all the evidence, arguments, statements of the Defendant, pre-sentence investigation, mental examination report, and all other information and reports which are relevant to the nature and circumstances of any mitigating factors, including but not limited to the nature and background of the Defendant, and all of the following:

"1. Whether the victim of the offense induced or facilitated.

"2. Whether it is unlikely that the offense would have been committed but for the fact that the offender was under duress, coercion or strong provocation.

"3. Whether at the time of the committing of the offense the Defendant, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirement of the law.

"4. The youth of the Defendant.

"5. The Defendant's lack of significant history of prior criminal convictions and delinquency adjudications.

"6. If the Defendant was a participant in the offense, but not the principal offender, the degree of the Defendant's participation in the offense and the degree of the Defendant's participation in the acts that led to the death of the victim.

"7. Any other factors that are relevant to the issue of whether the Defendant should be sentenced to death.

"The prosecution has the burden to prove beyond a reasonable doubt that the aggravating circumstances, of which the Defendant was found guilty, outweigh the factors in mitigation of imposing the death sentence.

"To outweigh means to weigh more than, to be more important than.

"The existence of mitigating factors does not preclude or prevent the death sentence. If the aggravating circumstances outweigh the mitigating factors.

"You are, of course, mindful of the definition given you earlier by the Court of the phrase reasonable doubt, and I will share that with you again. Reasonable doubt is present when after you have carefully considered and compared all the

evidence, you cannot say you are firmly convinced of the truth of the charges.

"Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral judgment is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

"You should recommend the sentence of death if you unanimously, that is all twelve of you, find proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

"If you do not so find, you should unanimously recommend either life sentence with parole eligibility after serving 20 years of imprisonment or life sentence with parole eligibility after serving 30 years of imprisonment."