JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Adam Hammad appeals from his conviction for felonious assault. For the reasons set forth below, we affirm.
 {¶ 2} On October 21, 2003, defendant was indicted pursuant to a four count indictment which charged him with one count of rape, two counts of kidnaping, and one count of felonious assault, all in connection with an alleged attack on Diana Hixon on August 27, 2003. Defendant pled not guilty and the matter proceeded to a jury trial on May 6, 2004.
 {¶ 3} For its case, the state presented the testimony of Margaret Fickey, Julie Ann Vesco, M.D., Portage County Deputy Kevin Thorn, Diana Hixon, Kevin West, Timothy Schrader, Joshua Hixon, Kathleen Hixon, Angela Zimmerman and Laura Parker.
 {¶ 4} Margaret Fickey testified that she and Hixon grew up together and were close. On August 27, 2003, Fickey learned from Hixon's stepmother that Hixon was in the hospital. Fickey arrived at the hospital and observed that Hixon had a bump on her head, had red marks on her body, appeared to be in pain and had difficulty moving. According to Fickey, Hixon appeared to have been badly beaten, was crying and said that defendant struck her.
 {¶ 5} Following her release from the hospital, Hixon did not return to the Cleveland area where she had been staying, but instead moved in with relatives in Ravenna. Approximately one month later, defendant went to a bar in Ravenna looking for Hixon. He subsequently came to Fickey's home. At this time, Fickey reportedly asked him about the incident and he apologized for what he had done, claiming that he was sorry and that he would get counseling.
 {¶ 6} On cross-examination, Fickey stated that she did not make a statement to police. She also indicated that Hixon told her that defendant had raped her, but reported only the assault, and not the rape to police. Fickey denied that she was drunk at the time of her conversation with defendant about the incident.
 {¶ 7} Dr. Vesco testified that she treated Hixon in the Emergency Room of Robinson Memorial Hospital. At this time, Hixon complained of pain in the rib area, said she could not take deep breaths, and asserted that she had been beaten up by her boyfriend. According to Dr. Vesco, Hixon stated that she had been trying to break off her relationship with defendant and wanted to leave, but he would not let her, and struck her in the knee, arm, and ribs.
 {¶ 8} Dr. Vesco noted that Hixon had a contusion on her forehead and that her ribs were tender. Vesco ordered x-rays of her ribs for a possible fracture. Although the radiologist later concluded that there was no evidence of fracture, Dr. Vesco reviewed the film and opined to a reasonable degree of medical certainty that there was evidence which could be interpreted as a fracture. Finally, Dr. Vesco testified that she treated Hixon as if she had a fractured rib, ordering pain medication and a breathing regimen for her.
 {¶ 9} On cross-examination, Dr. Vesco admitted that a radiologist has superior knowledge in reading x-rays. She also admitted that the contusion on Hixon's head was difficult to see from photographs taken in the hospital. Dr. Vesco also was unsure whether Hixon had contacted any of the agencies to which she had been referred following her discharge from the hospital.
 {¶ 10} Deputy Kevin Thorn testified that he responded and went to the hospital to speak with Hixon and observed that she was moaning and crying. Although she was difficult to understand, he took a statement from her and photographed her injuries. After learning that the attack took place in Cleveland, Thorn contacted Cleveland police.
 {¶ 11} On cross-examination, Thorn stated that Hixon did not indicate that she had been raped.
 {¶ 12} Diana Hixon testified that she has known defendant for ten years and has been in an on again/off again relationship with him since 1997. The relationship was renewed in April 2002, and Hixon and defendant began living together in Cleveland later that year.
 {¶ 13} Hixon testified that she injured herself on August 27, 2003, when she fell while going up the steps at defendant's parents' home. She further claimed that she injured her head on the previous day when she was getting into her car from the passenger's side. Later, while in Portage County getting her daughter, Hixon went to the hospital.
 {¶ 14} Hixon stated that she was in pain but denied that it hurt to breathe deeply. Hixon admitted that she and defendant had argued. She stated, however, that she became angry after she saw him talking to another woman and then made up the story that he had assaulted her.
 {¶ 15} Hixon insisted that Deputy Thorn made her press charges and that most of her statements to him that day and most of the statement she made four days later to Cleveland Police Officer Laura Parker were untrue. Specifically, Hixon stated that she lied when she stated that defendant had confronted her while she was in her car, grabbed her car keys, grabbed her by the hair and pulled her back to the house, pinned her down, spit on her, pulled her to the basement by her hair, threw her on the floor, sat on her chest, and banged her head against the floor. Hixon also denied that defendant raped her.
 {¶ 16} Hixon denied telling Fickey that defendant assaulted her and claimed that she and Fickey laughed together in the hospital. She also claimed that Fickey and other members of her family were angry at her for moving from Ravenna to Cleveland. Hixon testified that she and her stepmother had fought over the custody of Hixon's six year-old child, that her stepmother refused to return the child to Hixon and had filed charges against her with the Department of Children and Family Services. Finally, Hixon testified that she later informed the officers that defendant did not assault her but they refused to dismiss the charges and insisted on going forward with the prosecution.
 {¶ 17} Kevin West, Hixon's uncle, testified that on August 27, 2003, Hixon drove to his house. At this time, she could not stop crying, appeared to have been badly beaten, and indicated that defendant had beaten her. West stated that he thought Hixon had a cracked rib from the way she was carrying herself. West drove Hixon to the hospital and, following her release from the hospital, Hixon stayed with relatives in Ravenna and did not return to Cleveland.
 {¶ 18} Timothy Schrader, a neighbor of Kevin West, testified that he was present when Hixon arrived at West's house. At this time, she was upset, crying, and appeared to be "in bad shape." (Tr. 258). She told the men that defendant had beaten her. Schrader helped Hixon get into West's truck and West then drove her to the hospital.
 {¶ 19} On cross-examination, Schrader admitted that Hixon's relatives were extremely emotional when they were forced to return Hixon's daughter to her.
 {¶ 20} Joshua Hixon testified that he is Diana Hixon's brother. He arrived at the hospital and observed that she had a mark on her forehead, a mark on her back, appeared to be very sore and could not tolerate being hugged. He further testified that Hixon stayed with her relatives in Ravenna after the incident. Defendant came to Ravenna to see her and, at this time, he told Joshua that he was sorry for what he had done and also spoke to Fickey.
 {¶ 21} Hixon's stepmother, Kathleen Dixon, testified that Hixon had been dating defendant since April 2002, and that they lived in Lakewood with defendant's brother. Kathleen acknowledged that she had been charged with interfering with custody for refusing to return Hixon's daughter to her, but she stated that she did not believe that it was in the child's best interest to return her to her mother.
 {¶ 22} Kathleen learned from a friend of Kevin West that Hixon was in the hospital then went there to see her. At this time, Hixon seemed to be in pain and was trembling and crying. After leaving the hospital, Hixon did not return to Lakewood and defendant, but instead stayed with Kathleen. For several days, Hixon held her ribs while she walked.
 {¶ 23} Kathleen further testified that defendant called her home to speak with Hixon. Kathleen told defendant that she could not believe that he would call after what he had done and defendant reportedly told Kathleen that he knew he had crossed the line and that he was sorry for what he had done.
 {¶ 24} On cross-examination, Kathleen testified that, while at the hospital, Hixon said she had been raped but she did not know whether Hixon had made this statement to police. Kathleen witnessed Hixon's signature on her police statement but she did not know its contents.
 {¶ 25} Angela Zimmerman testified over defense objection that defendant had assaulted her in 1998 after they broke up. On September 4, 1998, after they had been broken up for approximately one month, Zimmerman saw defendant walking. He reportedly told her to pull her vehicle over. He then grabbed her car keys, forced her down an alley, assaulted and threatened to kill her then dragged her by the hair to an old car and raped her.
 {¶ 26} On cross-examination, Zimmerman acknowledged that hospital personnel determined that there was no evidence of semen, but she stated that she had refused a rectal examination. She further acknowledged that defendant entered a guilty plea to felonious assault and that charges of rape, kidnapping and intimidation were dismissed by the state.
 {¶ 27} Cleveland Police Officer Laura Parker testified that the matter was referred to her from Portage County and she contacted Hixon and set up an appointment for her to make a statement. The women met several days after Hixon was released from the hospital and Hixon then made and signed a written statement. Hixon did not indicate that defendant raped her but did indicate that he beat her.
 {¶ 28} Approximately four days later, defendant called Parker and informed her that Hixon was pregnant, that they were back together, and that he was "going to step up to the plate." Parker later learned that Hixon recanted her claims. Parker and Hixon both testified before the grand jury, and defendant was indicted.
 {¶ 29} Defendant elected to present evidence. With regard to the incident involving Zimmerman, defendant stated that he plead guilty to assaulting her but the state dismissed a rape charge against him for lack of evidence. With regard to this instant matter, defendant testified that Hixon saw him talking to another woman in a store parking lot and then became irate. The two went to his parents' house in Cleveland to discuss the matter. Hixon remained angry and was also upset that he would not be going to Ravenna with her to pick up her daughter. She eventually walked away from him and he grabbed her arm.
 {¶ 30} They later had sex then he went to take a shower, and she said something about getting back photographs that he had taken of her. According to defendant, Hixon fell as she went upstairs, and he reached down and helped her up. Later, he saw her drive away, but she was not crying.
 {¶ 31} Defendant denied assaulting Hixon and denied apologizing to Kathleen, Joshua or Fickey. He said that he thought that Hixon went to the hospital solely because she had fallen on the steps. Defendant further testified that Hixon was willing to "clean up" her lies to police and that he did not coerce her into recanting her previous statements.
 {¶ 32} On cross-examination, defendant stated that he did not know the last name of the woman to whom he had spoken in the parking lot. He claimed that Hixon fabricated her initial allegations to be similar to what she knew about Angela Zimmerman's allegations.
 {¶ 33} Hixon testified that she had spoken to Zimmerman and knew about the charges she had filed. She maintained that she had hurt herself in the fall on the steps and lied because she was angry at defendant. She remained angry when she met with Officer Parker four days later, but subsequently informed Officer Parker that she did not wish to press charges.
 {¶ 34} The jury acquitted defendant of rape and one count kidnaping, deadlocked on the second charge of kidnaping, and convicted defendant of felonious assault. The trial court sentenced him to five years imprisonment. Defendant now appeals and assigns four errors for our review.
 {¶ 35} Defendant's first assignment of error states:
 {¶ 36} "Appellant's conviction for felonious assault was based upon insufficient evidence as a matter of law on the elements of A) physical assault and B) serious physical harm."
 {¶ 37} Within this assignment of error, defendant asserts that there was no substantive evidence to demonstrate that he assaulted Hixon or that she suffered serious physical harm, as the sole evidence as to these issues was Hixon's prior inconsistent statements which are not substantive evidence. We do not agree.
 {¶ 38} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
 {¶ 39} The elements of felonious assault are knowingly causing serious physical harm to another. R.C. 2903.11(A)(1).
 {¶ 40} When a prior inconsistent statement is offered for the purpose of impeachment, the trier of fact may only consider the prior statement as substantive evidence if the prior statement is not inadmissible as hearsay. Dayton v. Combs (1993), 94 Ohio App.3d 291, 640 N.E.2d 863;State v. Parsons, Wood App. No. WD-03-051, 2004-Ohio-2216; State v.Hancock, Hamilton App. No. C-030459, 2004-Ohio-1492.
 {¶ 41} Under Evid.R. 803,
 {¶ 42} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 {¶ 43} "* * *
 {¶ 44} "(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
 {¶ 45} "* * *
 {¶ 46} "(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
 {¶ 47} Under Evid.R. 803(2), hearsay statements may be introduced at trial as "excited utterances" if certain conditions are met. State v.Duncan (1978), 53 Ohio St.2d 215, 373 N.E.2d 1234, paragraph one of the syllabus. First, there must be a startling event that produces a nervous excitement in the declarant, which stills reflective capabilities. Id. Second, if the statement is not made contemporaneously with the startling event, then the statement must have been made while declarant was still in a nervous state without the opportunity to reflect on the startling event. Id. Third, the statement must be related to the startling event. Id. Finally, the declarant must have the opportunity to personally observe the matters asserted in the statement. Id.
 {¶ 48} Applying the foregoing, we cannot agree that insufficient evidence was presented in support of the felonious assault conviction. As an initial matter, Hixon's statements for medical treatment and diagnosis indicate that she had been beaten by her boyfriend and that she experienced pain in breathing deeply. The state also presented extensive evidence of Hixon's excited utterances, made as she arrived at West's house, in which she stated that defendant had beaten and kicked her. As these prior inconsistent statements were not hearsay under Evid.R. 803, they could be considered as substantive evidence.
 {¶ 49} Finally, in State v. Walker (June 18, 1987), Cuyahoga App. No. 52391, this court held that, where injuries are serious enough to cause a victim to seek medical treatment, a jury may reasonably infer that the force used by a defendant caused serious physical harm. Accord State v.Williams, Cuyahoga App. No. 83402, 2004-Ohio-4085.
 {¶ 50} In accordance with all of the foregoing, a rational trier of fact could have concluded beyond a reasonable doubt that defendant knowingly caused serious physical harm to Hixon. Her excited utterances and statements in furtherance of medical treatment establish the assault and the jury could infer from her visit to the Emergency Room that she suffered serious physical harm.
 {¶ 51} The first assignment of error is without merit.
 {¶ 52} Defendant's second assignment of error states:
 {¶ 53} "The trial court erred to the prejudice of appellant in allowing other acts evidence."
 {¶ 54} Defendant next complains that the trial court erred in permitting the state to introduce testimony concerning defendant's assault upon Angela Zimmerman.
 {¶ 55} As an initial matter, we note that it is axiomatic that "the admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343, paragraph two of the syllabus; see, also, State v. Bey,85 Ohio St.3d 487, 490, 1999-Ohio-283, 709 N.E.2d 484. Where an error in the admission of evidence is alleged, appellate courts do not interfere unless it is shown that the trial court clearly abused its discretion.State v. Maurer (1984), 15 Ohio St.3d 239, 473 N.E.2d 768. The admission or exclusion of evidence, including the admission of other acts evidence, lies within the trial court's sound discretion. State v. Bey,
supra.
 {¶ 56} Evid.R. 404(B) provides that evidence of other acts is not admissible to prove the character of a person in order to show that the accused acted in conformity therewith. Evidence of other bad acts is generally prejudicial and generally is prohibited by Evid.R. 404(B). See, e.g., State v. Curry (1975), 43 Ohio St.2d 66, 68-69, 330 N.E.2d 720.
 {¶ 57} Generally, "an accused cannot be convicted of one crime by proving he committed other crimes or is a bad person." State v. Thornton
(April 1, 1999), Cuyahoga App. No. 73232, citing State v. Jamison
(1990), 49 Ohio St.3d 182, 552 N.E.2d 180. Consequently, "evidence of other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity." Id. at 15.
 {¶ 58} There is, however, an exception to the general rule against admissibility of prior bad acts:
 {¶ 59} "While `other acts' evidence may not be used to prove criminal propensity, such evidence may be admissible `if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove notice, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" Id., citing State v. Lowe, 69 Ohio St.3d 527, 530, 1994-Ohio-345,634 N.E.2d 616.
 {¶ 60} In State v. Lowe, supra, the Supreme Court explained:
 {¶ 61} "Other acts may also prove identity by establishing a modus operandi applicable to the crime with which a defendant is charged. `Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B).' State v. Jamison
(1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus. `Other acts' may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense.' Statev. Smith (1990), 49 Ohio St.3d 137, 141, 551 N.E.2d 190, 194. While we held in Jamison that `the other acts need not be the same as or similar to the crime charged,' Jamison, syllabus, the acts should show a modus operandi identifiable with the defendant. State v. Hutton (1990),53 Ohio St.3d 36, 40, 559 N.E.2d 432, 438.
 {¶ 62} "A certain modus operandi is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator. Other-acts evidence is admissible to prove identity through the characteristics of acts rather than through a person's character. To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question."
 {¶ 63} Id.
 {¶ 64} In this matter, we find no abuse of discretion. The state presented evidence that defendant confronted her while she was in her car, then grabbed her car keys, grabbed her by the hair and pulled her back to the house, pinned her down and assaulted and raped her. The state's evidence also established that defendant confronted Zimmerman while she was in her car, took the keys, pulled her by the hair and assaulted and raped her. The evidence shows an identifiable scheme was used in the commission of both offenses and demonstrate a modus operandi identifiable with the defendant.[1]
 {¶ 65} This assignment of error is without merit.
 {¶ 66} Defendant's third assignment of error states:
 {¶ 67} "Appellant's conviction was against the manifest weight of the evidence."
 {¶ 68} In State v. Thompkins, supra, the court illuminated its test for manifest weight of the evidence as follows:
 {¶ 69} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." Black's [Law Dictionary (6 Ed. 1990)], at 1594."
 {¶ 70} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Id., citing Tibbsv. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652,663. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See Statev. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720-721.
 {¶ 71} The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id.
 {¶ 72} In this matter we cannot conclude that the jury lost its way. The state's witnesses established that Hixon drove from Cleveland to Ravenna immediately following the assault, and clearly and consistently reported to friends, family, and hospital personnel, that defendant had beaten her. Her subsequent testimony that she struck her head getting into the passenger side of her car and that she fell while going up carpeted steps were not logical, and her attempts at minimizing the extent of her injuries was not credible. Likewise, defendant's testimony was not credible as he claimed that he and Hixon argued, had make-up sex then continued to argue, and he failed to show genuine surprise or concern during the time she was in the hospital. Moreover, the state's evidence demonstrated that Hixon had sustained injuries to her head, arm, leg and back and that one of her ribs may have been fractured, and that she was in fact treated under the same protocol which would have been prescribed for a fractured rib. Hixon's claim at trial that she merely experienced uncomfortable pain was not consistent with the evidence that, following the incident, Hixon recuperated with relatives in Ravenna and continued to hold her side when she walked. The conviction is not against the manifest weight of the evidence.
 {¶ 73} This assignment of error is without merit.
 {¶ 74} Defendant's fourth assignment of error states:
 {¶ 75} "Appellant was denied his constitutional right to the effective assistance of counsel at trial."
 {¶ 76} Within this assignment of error, defendant asserts that his trial counsel was ineffective for failing to object to Hixon's hearsay statements regarding the assault, failed to request a limiting instruction to inform the jury that impeachment evidence is not substantive evidence, and failed to request a limiting instruction to inform the jury that the evidence pertaining to Zimmerman's assault could be used only for a limited purpose.
 {¶ 77} In order to demonstrate ineffective counsel, defendant must show not only that his counsel's representation fell below the standard of that of competent attorneys, but also that, but for that substandard representation, the outcome of his trial would have been different.Strickland v. Washington (1984), 466 U.S. 668, 80 L.Ed.2d 674,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. Counsel's performance may be found to be deficient if counsel "made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. To establish prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley, supra, paragraph two of the syllabus; see, also, Strickland, 466 U.S. at 687. Moreover, when a reviewing court considers an ineffective assistance of counsel claim, it should not consider what, in hindsight, may have been a more appropriate course of action. See State v. Phillips, 74 Ohio St.3d 72,85, 656 N.E.2d 643, 1995-Ohio-171 (stating that a reviewing court must assess the reasonableness of the defense counsel's decisions at the time they are made). Rather, the reviewing court "must be highly deferential."Strickland, 466 U.S. at 689. As the Strickland Court stated, a reviewing court:
 {¶ 78} "Must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id.466 U.S. at 689; see, also, State v. Hamblin (1988), 37 Ohio St.3d 153,524 N.E.2d 476, certiorari denied (1988), 488 U.S. 975, 102 L.Ed.2d 550,109 S.Ct. 515.
 {¶ 79} With regard to the first and second claim advanced by defendant, we note that statements admitted under Evid.R. 613(B) require a limiting instruction to inform the jury that the prior statements were only to be considered for impeachment purposes. State v. Armstrong,
Trumbull App. Nos. 2001-T-0120, 2002-T-0071, 2004-Ohio-5635. However, as noted previously, when a prior inconsistent statement is offered for the purpose of impeachment, the trier of fact may consider the prior statement as substantive evidence if the prior statement is not inadmissible as hearsay. Dayton v. Combs, supra; State v. Parsons, supra. In this case, some of the prior statements were excited utterances and some were statements in furtherance of medical treatment and diagnosis so they were not hearsay and could be considered as substantive evidence. Counsel was therefore not ineffective for failing to object to the prior excited utterance and the prior statement made in support of medical treatment, and was not ineffective in failing to request a limiting instruction.
 {¶ 80} As to the evidence concerning the assault of Zimmerman, we note that the Court did instruct the jury that it could not consider defendant's previous conviction to prove defendant's character or to show that he acted in conformity there and that the conviction could be used for the limited purpose of testing defendant's credibility, and could not be used for any other purpose. (Tr.567). Counsel therefore did not err.
 {¶ 81} The fourth assignment of error is without merit.
Affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Rocco, J., and Kilbane, J., concur.
[1] Additionally, we note that defendant claimed that Hixon fabricated her initial allegations to be similar to what she knew about Angela Zimmerman's allegations.