OPINION
Defendant-appellant Barry Goodwin appeals from his conviction of murder with a firearm specification that was entered after a jury trial in the Mahoning County Common Pleas Court. For the following reasons, appellant's conviction is affirmed.
 STATEMENT OF THE CASE
The body of Wesley Moore was discovered on Mill Creek Park property in May 1998. He died of a gunshot wound to the head which entered just above his left eye. According to Andre Maxwell's statement to police and testimony at trial, Wesley Moore and Andre Maxwell were driving around on May 5, 1998 when they picked up appellant. He admitted that they all smoked marijuana. (Tr. 159). Andre Maxwell said that Wesley Moore and appellant were arguing, calling each other "niggers" and "bitches." During the argument, Wesley Moore pulled the car over and turned to face appellant who was sitting in the passenger seat. Suddenly, appellant pulled out a chrome, snub-nosed .38 caliber revolver and shot Wesley Moore in the head. (Tr. 163). Andre Maxwell stated that appellant told him to get in the front seat and drive. He related that when they stopped near Idora Park, appellant pointed the gun at him and told him to dispose of the body. When he unsuccessfully tried to drag the body to the weeds, appellant assisted. Andre Maxwell then testified that he left the park with appellant driving and subsequently crashing into a telephone pole. They abandoned the car and ran. A 911 call was made to the police department at 9:42 p.m. reporting a crash on Clearmount Street and the fact that two people ran from the scene of the accident. (Tr. 321).
Appellant signed a confession at the Mill Creek Park Police Department after initially denying any involvement. His signed statement is very similar to that of Andre Maxwell. However, at trial, appellant testified that he was not present during the murder. He claimed that he felt pressure to confess from police and that the reason that his statement is similar to that of Andre Maxwell is because the police read him Andre Maxwell's statement more than once. Captain John Lynch of the Mill Creek Police Department testified that he did not read Andre Maxwell's statement to appellant. He noted that appellant named the type of gun, location of the body and location of the crash and that he did not reveal any of this information to appellant. (Tr. 329, 623).
Appellant presented alibi witnesses after he testified that he was at a friend's house from early in the morning on May 5 until he went to bed at that house. His first witness testified that she saw appellant at her house from the time she got off work at 4:00 p.m. until she left him there at 7:00 or 8:00 p.m. (Tr. 382). This witness's roommate testified that appellant was still there when he went up to bed at 8:30 or 8:45 p.m. (Tr. 379). Another witness testified that Wesley Moore stopped at his house twice prior to his death at 8:00 or 9:00 p.m. This witness stated that he saw Andre Maxwell in the front seat and a "husky boy" with "wild hair" in the back seat. (Tr. 512). At trial, he opined that appellant was not the person in the backseat. Captain Lynch was then recalled to testify that this witness had previously stated that he could not describe the person in the back seat except to say he was wearing a black jacket. (Tr. 621).
On July 27, 1999, a jury found appellant guilty of murder with a firearm specification. Appellant was sentenced to three years of actual incarceration plus fifteen years to life in prison. This timely appeal resulted.
 ASSIGNMENT OF ERROR NUMBER ONE
Appellant's first assignment of error claims:
 "DEFENDANT/APPELLANT WAS DENIED HIS RIGHT TO A SPEEDY TRIAL AS THE STATE OF OHIO FAILED TO BRING HIS CASE TO TRIAL WITHIN THE TIME REQUIREMENTS AS SET FORTH IN ARTICLE I, SECTION 10 OF THE CONSTITUTION OF OHIO AS WELL AS THE CONSTITUTION OF THE UNITED STATES OF AMERICA, CODIFIED AT OHIO REVISED CODE SECTION 2945.71."
Appellant was arrested on May 18, 1998. A felon must be brought to trial within two hundred seventy days of arrest. R.C. 2945.71(C)(1). Because he was incarcerated in lieu of jail at the time, each day counts as triple time. R.C. 2945.71(E). Thus, according to appellant, the state was required to, but did not, bring him to trial by August 16, 1998.
Appellant notes that the docket evidences that he filed a waiver of his speedy trial rights on August 11, 1998; however, the clerk noted that the waiver document was "missing." He states that without an express written waiver in the record, there is no evidence that he waived his speedy trial rights. See State v. King (1994), 70 Ohio St.3d 158, 161 (requiring for a valid waiver of speedy trial rights, a filed written waiver or an oral waiver on the record in open court).
Contrary to appellant's assertions, a defendant must raise an alleged violation of speedy trial rights "at or prior to commencement of trial." R.C. 2945.73(B). Hence, a defendant cannot raise a speedy trial issue for the first time on appeal. State v. Brown (Dec. 19, 1999), Belmont App. No. 99BA13, unreported, 2 (citing a case from every appellate district except the First District). As appellant failed to file a motion to dismiss at or prior to commencement of trial, he waived any argument in this court regarding a speedy trial violation.
Furthermore, upon reading appellant's brief, the state moved to supplement the record with the missing written waiver signed by both appellant and his defense attorney and time-stamped on August 11, 1998. We sustained the state's motion to supplement the record on April 21, 2001. Appellant did not object to this supplementation. Obviously, appellant's defense attorney did not file a motion to dismiss in the trial court based on speedy trial violations because he knew that he and appellant had signed a timely waiver of appellant's speedy trial rights. Because appellant expressly waived his right to a speedy trial in a signed writing that was time-stamped prior to the date that his speedy trial rights expired, appellant's speedy trial rights were not violated. For the foregoing reasons, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER TWO
Appellant's second assignment of error contends:
 "THE STATE ERRORED [sic] IN PERMITTING THE STATE OF OHIO TO CROSS EXAMINE DEFENDANT/APPELLANT REGARDING A 1995 JUVENILE COURT ADJUDICATION INVOLVING A STOLEN HANDGUN AND IN ALLOWING THE PROSECUTION TO REPEATEDLY COMMENT ON THE SAME."
On direct examination, appellant testified that while he was being questioned at the Mill Creek Park Police Station, he did not know that he could request a lawyer. He claimed that he knows nothing about the law. He stated that he signed the rights waiver, but he did not know what he was signing. He said that the police read the waiver to him, but he did not understand what they told him. (Tr. 404). He said he had previously heard rights read only on television but did not know they were the real rights of defendants. (Tr. 405). He stated that when the police told him that they were going to call the prosecutor, he did not know what a prosecutor was. (Tr. 409).
While still on direct examination, appellant noted that when he was a juvenile he did bad things. He then explained, "little stuff" like stealing cars for joy riding. (Tr. 414). He claimed that he never owned a gun and did not know what a .38 caliber weapon was until the police told him. (Tr. 418). He later admitted that he was familiar with small firearms as a result of merely living in Youngstown.
During cross examination, appellant claimed that he did not know that he could ask for a lawyer and that he has never consulted with a lawyer before. (Tr. 448). The state attempted to impeach this testimony by asking about his experience with the legal system when he stole cars. The state then asked if appellant gave a statement when he was caught receiving stolen property. The defense objected to the reference to a juvenile conviction. (Tr. 452). The court overruled the objection. The state then asked if appellant was found guilty of possessing a stolen .25 caliber handgun as a juvenile. Appellant answered affirmatively but stated that it was not his gun and that he was holding it for a friend for whom he took the blame. He stated that he may have had a lawyer representing him during that juvenile adjudication, but he did not know it was a lawyer.
During closing arguments, the state mentioned the juvenile conviction multiple times. (Tr. 631, 632, 636, 682, 691, 699). For instance, the state pointed out that appellant claimed he did not know about guns or lawyers but admitted to possessing a stolen firearm and going through a juvenile adjudication. The state noted that according to appellant's testimony, both now and at the juvenile adjudication, he confessed to acts that he did not do.
On appeal, appellant argues that the court erred in overruling defense counsel's objection to the state's questioning on appellant's juvenile adjudication for possessing a stolen firearm. Evid.R. 609 is entitled, "Impeachment by evidence of conviction of crime." Generally, evidence that the defendant has been convicted of a felony or a crime of dishonesty may be admitted if the probative value outweighs the danger of unfair prejudice, confusion of the issues or misleading of the jury. Evid.R. 609(A) (2) and (3). The rule drafters left the admissibility of juvenile adjudications to the legislature by promulgating Evid.R. 609(D) which provides that evidence of a juvenile adjudication is not admissible except as provided by statute. The relevant statute provides in part:
 "Evidence of a judgment rendered and the disposition of a child under the judgment is not admissible to impeach the credibility of the child in any action or proceeding. Otherwise, the disposition of a child under the judgment rendered or any evidence given in court is admissible as evidence for or against the child in any action or proceeding in any court in accordance with the Rules of Evidence * * *." R.C. 2151.358(H).
Pursuant to Evid.R. 404(B), evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This type of evidence may be admissible, however, for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Citing this rule, the state contends that it was not using appellant's juvenile adjudication to impeach him as prohibited by R.C. 2151.358(H) and Evid.R. 609(D). Rather, the state argues that it was using the prior adjudication to show appellant's knowledge about guns and his rights such as the right to counsel.
In reviewing the case law interpreting the rule and statute excluding juvenile adjudications for impeachment purposes, it appears that there is a distinction between general impeachment and specific impeachment. SeeState v. Hilty (Oct. 19, 1990), Trumbull App. No. 89T4204, unreported, 3. Where the submission of the juvenile adjudication is done merely to disclose that the adjudication exists in order to denigrate the former offender's general credibility, the juvenile adjudication is inadmissible. However, where submission of the juvenile adjudication is done for the purposes of specifically impeaching the credibility of the former offender, the adjudication appears to be admissible. Id. at 4 (distinguishing between a general attack on credibility as contemplated in R.C. 2151.358(H) and specific use of a prior conviction to explicitly contradict one's testimony). For instance, a prior juvenile adjudication may be admitted to specifically impeach a witness's credibility by establishing bias. Moreover, where the witness testifies about an aspect of his life in a favorable manner, the opponent may use juvenile adjudications to specifically contradict that testimony.
In State v. Robinson (1994), 98 Ohio App.3d 560, the Eighth District held that the state could ask about a defendant's juvenile record where that defendant stated that his gang is nonviolent and does not contain members with criminal records. The court upheld the questioning, citing R.C. 2151.358(H), Evid.R. 609(D), Evid.R. 404(B) and Evid.R. 404(A)(1) (which allows evidence on a character trait to be offered by the state to rebut the same). "The purpose of Evid.R. 609(D) and R.C. 2151.358(H) has always been to prohibit the use of a juvenile adjudication for purposes of general impeachment of a witness's credibility." Id. at 568, citingState v. Cox (1975), 42 Ohio St.2d 200, 204. See, also, State v.Marinski (1942), 139 Ohio St. 559 (stating that when a defendant introduces evidence of his life history, he waives the protection afforded by the former version of the juvenile adjudication statute and may be cross examined regarding a juvenile charge).
In the case at bar, appellant is the one who raised the issue of his prior juvenile life of crime testifying on direct that he did "bad things" and gave stealing cars as an example. Appellant claimed that he never consulted with a lawyer, knew nothing about the law, did not know that he had the right to a lawyer, did not know what prosecutor meant, did not know what a .38 caliber weapon was and never owned a gun. The existence of these precursors entitled the state to cross examine appellant about his juvenile adjudication for possessing a stolen firearm. His admission of that adjudication was sought to specifically contradict his testimony that he never owned a gun. It also specifically contradicted his testimony that he never consulted with a lawyer. The juvenile adjudication was also used to demonstrate that he had more knowledge than he claimed about the law, his rights and firearms. Appellant basically opened the door to the questions.
Even if a juvenile adjudication is admitted in violation of R.C.2151.358(H), it must be determined whether the effect is so prejudicial that a new trial is required. See State v. Shedrick (1991),59 Ohio St.3d 146, 150; Crim.R. 52(A); Evid.R. 103(A)(1). In this case, the state presented the confession of appellant which was corroborated by the statement and testimony of an eyewitness. Even assuming arguendo that the court erred in admitting the evidence of appellant's juvenile adjudication for possessing a stolen firearm, this admission is not so prejudicial as to require a new trial as substantial other evidence supported the verdict. See State v. McNeill (1998), 83 Ohio St.3d 438,447. Accordingly, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE
Appellant's third assignment of error alleges:
 "THE TRIAL COURT ERRORED [sic] IN ITS DECISION REGARDING DEFENDANT/APPELLANT'S MOTION TO SUPPRESS HIS STATEMENT GIVEN TO DETECTIVES."
Appellant's motion to suppress alleged that appellant did not knowingly and intelligently waive his right to counsel or his right against self-incrimination because he did not understand these rights or the signed waiver that was read to him. The motion claimed that appellant lacked the capacity to understand his Miranda rights due to his substandard intelligence. The motion also contended that appellant's confession was not made or signed voluntarily.
At the suppression hearing, the state presented the testimony of three officers involved in the interrogation of appellant. Captain Lynch testified that he read appellant his rights and appellant said that he understood and signed the rights waiver. He stated that appellant was read his rights again prior to the taking of the final statement. He claimed that appellant said that he did not want an attorney. (Tr. 15). He noted that appellant stated, "I do a little of both," when asked if he could read and write. He testified that appellant had a temporary driving permit which requires the passing of a written examination. (Tr. 20). He stated that from the beginning, appellant asked many sensible questions about how the officers knew certain things. (Tr. 18).
Captain Lynch noted that appellant's statement was read to him at least twice, once by the officer who transcribed it and once by an officer who was brought to the station at appellant's request. Captain Lynch admitted that after giving the statement, appellant refused to sign it, although he did not deny responsibility. He told appellant that it was appellant's decision but he may be charged with aggravated murder. (Tr. 30). He admonished appellant for wasting his time. He also explained that he conferred with city prosecutor Dionne Almasy throughout the day and put appellant on the phone with her at one point.
Officer Yeckel then testified that he transcribed the questions asked by Captain Lynch and the answers given by appellant. He said that appellant did not appear confused and did not deny responsibility for the homicide. (Tr. 55, 60). Finally, the state presented the testimony of Officer Drayton, whose presence appellant requested as he was appellant's coach and friend. He opined that appellant appeared nervous but seemed to understand the questions asked of him. (Tr. 69-70). Officer Drayton also testified that appellant admitted he shot Wesley Moore but that appellant then appeared confused over whether he wanted to admit it.
Appellant presented the testimony of his mother and his former teacher. The teacher testified that appellant was in his ninth grade developmentally handicapped class at Wilson High School for three years. He opined that appellant reads and comprehends at a first or second grade level. He claimed that appellant could only understand the waiver form that was read to him by police if they read and explained it sentence by sentence multiple times. (Tr. 83). The teacher concluded that appellant could not make a voluntary, knowing and intelligent waiver as per the form. (Tr. 84).
Appellant's mother testified that various psychiatrists told her that he was borderline retarded. The defense submitted a report of a psychiatrist from five years before which found appellant to be mildly retarded. Appellant's mother opined that appellant will say he can understand a concept if asked because he is embarrassed to admit that he cannot understand it. (Tr. 101).
The defense also focused the time frame involved: appellant was brought to the station at 9:45 a.m.; he signed the rights waiver at 11:55 a.m.; the transcription of his statement began at 12:40 p.m. and ended at 1:50 p.m. The state noted that Captain Lynch testified that much of the delay was caused by the search for Officer Drayton at appellant's request.
The court overruled the suppression motion and released a judgment entry which advised the reader to see the record for findings and conclusions. On the record, the court stated that it believes that appellant has a limited mentality and that the officers "went by the book." (Tr. 107). The court pointed out that the officers went out of their way to find a person whose presence was requested by appellant. The court then opined that the evidence presented does not render the confession inadmissible but is evidence which goes to the weight or credibility of the confession.
This assignment of error contains two issues: (1) whether appellant voluntarily, knowingly and intelligently waived his right to an attorney and his rights against self-incrimination, and (2) whether the statement was made voluntarily. Both issues are determined by reviewing the totality of the circumstances. State v. Moore (1998), 81 Ohio St.3d 22,31. It must be remembered that issues of weight and credibility which arise at a suppression hearing are primarily the province of the trial court. State v. Eley (1996), 77 Ohio St.3d 174, 178.
In this case, the court found that the waiver of rights signed by appellant was validly executed. A signed waiver is strong proof that the waiver is valid. Moore, 81 Ohio St.3d at 32. Even if appellant's reading comprehension skills are poor, the statement was read to him. Appellant's mother mentioned that appellant had previous experience with the juvenile justice system. These prior dealings with the criminal justice system can be considered as a factor in reviewing the validity of the waiver. Statev. Hill (1992), 64 Ohio St.3d 313, 318. When asked by police, appellant answered that he did not want a lawyer and instead asked for "Coach Drayton." His request was granted.
Limited mental capacity is but one consideration; it is not an outcome determinative factor. State v. Clark (1988), 38 Ohio St.3d 252, 261
(finding a valid waiver by a defendant with an impaired ability to make choices due to brain damage where he heard his rights read five times, he acknowledged he understood his rights and he signed the waiver); Statev. Dailey (1990), 53 Ohio St.3d 88, 91 (finding a valid waiver where the defendant had an IQ of 71 and a reading level below third grade); Statev. Edwards (1976), 49 Ohio St.2d 31, 40 (finding a valid waiver where the defendant had a low IQ and read at a second grade level). Moreover, the court could consider the fact that appellant appeared to have successfully completed a written examination in order to receive a driving permit. According, appellant's argument that his waiver was not knowing and intelligent is overruled.
As for appellant's argument that his confession was involuntary, "evidence of police coercion or overreaching is necessary for a finding of involuntariness, and not simply evidence of a low mental aptitude of the interrogee." Hill, 64 Ohio St.3d at 318. Coercive tactics include physical abuse, threats, and food, medical, or sleep deprivation.
The defense's claim that the length of custody was excessive is without merit. Custody from 9:45 a.m. until the statement began three hours later is not excessive. Further, much of the time lapse was due to appellant's request for Officer Drayton's presence. Contrary to appellant's allegation, Captain Lynch's references to the range of charges he could face, from aggravated murder to voluntary manslaughter, is not coercive.State v. Loza (1994), 71 Ohio St.3d 61, 67 (holding that informing the defendant about the consequences of his actions does not constitute a threat to make the defendant confess and promises that cooperation would be considered and a confession would be helpful are not prohibited). Officer Drayton and possibly Dionne Almasy told appellant to tell the truth; however, "[a]dmonitions to tell the truth are considered to be neither threats nor promises and are permissible." Id. The trial court considered the evidence presented at the suppression hearing and found that coercive police tactics were not employed. (Tr. 107). As there exists no reason to second-guess the decision of the trial court, this argument is overruled. In accordance, appellant's third assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER FOUR
Appellant's fourth assignment of error contends:
 "THE TRIAL COURT ERRORED [sic] IN ITS DECISION AS TO THE ADMISSIBILITY OF THE STATEMENT OF DEFENDANT-APPELLANT."
Under this assignment of error, appellant merely contends that the trial court violated the procedural rule set forth in Simms v. Georgia
(1967), 385 U.S. 538. The rule in that case is as follows:
 "[A] jury is not to hear a confession unless and until the trial judge has determined that it was freely and voluntarily given. The rule allows the jury to give absolutely no weight to the confession in determining the guilt or innocence of the defendant but it is not for the jury to make the primary determination of voluntariness. Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." Id. at 643.
In the case at bar, the trial court presided over a suppression hearing. After hearing the testimony and reviewing all exhibits submitted by both sides, the court made multiple statements concerning its findings and conclusions on the record. (Tr. 106-108). As aforementioned, the court agreed that appellant has a limited mental capacity. The court then found that the police did not use improper tactics. The court noted that complying with appellant's request for Officer Drayton "was a good move." (Tr. 107). The court concluded that the case put on by the defense "is an attack not on the admissibility of that statement, but on the weight to be given it," noting that the jury can consider the weight of the statement (Tr. 108). The court overruled the suppression motion in a judgment entry which directed the reader to its statements made on the record.
From the court's statements, appellant believes that the court failed to rule on admissibility and did not consider whether the statement was made voluntarily or whether he knowingly waived his rights. However, the court found that appellant was read his rights and praised the police interrogation practices. It seems clear that the court found a knowing waiver and no coercive tactics in gaining the statement. The court specifically stated that the jury could consider the weight to give the confession as the Supreme Court said was permissible in Simms. Contrary to appellant's suggestions, the court did not forgo its primary determination of admissibility or imply that the jury could consider whether the waiver was unknowing or the statement was involuntary. As such, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER FIVE
Appellant's fifth assignment of error provides:
 "THE TRIAL COURT ERRORED [sic] IN GRANTING THE PROSECUTION'S MOTION IN LIMINE PROHIBITING DEFENDANT/APPELLANT FROM INTRODUCING, AT TRIAL, EVIDENCE OF DEFENDANT/APPELLANT'S LIMITED MENTAL CAPACITY WITH REGARD TO THE PURPORTED CONFESSION OF DEFENDANT/APPELLANT AND THE CIRCUMSTANCES SURROUNDING THE SAME."
Because the judge who presided over the suppression hearing mentioned that the evidence submitted by the defense at the suppression hearing went to weight rather than admissibility, the defense decided to present the testimony of the teacher at trial before a different trial judge. The state filed a motion in limine seeking to prevent the defense from introducing evidence of appellant's mental capacity in order to demonstrate that the confession was involuntary and the rights waiver was unknowing. The state further noted that the defense wanted to present the testimony of city prosecutor Dionne Almasy to establish trickery by the police and that appellant was under duress when he confessed. The state asked that neither the teacher nor Dionne Almasy be permitted to testify.
The state also argued that the testimony of a person who taught appellant three years before is not relevant to whether appellant committed the murder. The court permitted the teacher to testify but limited his testimony to the fact that appellant was a former student in his developmentally handicapped class. The court noted that the teacher is not an expert. (Tr. 247). The court also excluded the testimony of Dionne Almasy. (Tr. 274-275).
Appellant now contends that excluding the testimony of the teacher and Dionne Almasy denied him the opportunity to challenge the weight and credibility of his confession. The state counters that appellant waived this argument because he failed to proffer evidence of what the excluded testimony would be. The state also reiterates its arguments that the jury may not consider evidence that the confession was involuntary.
Pursuant to Evid.R. 103(A)(2), error may not be predicated upon an exclusion of evidence ruling unless a substantial right is affected and the substance of the evidence was made known to the court or was apparent from the context. The record does not contain a proffer of the testimony of the teacher by the defense. However, the state placed on the record that the teacher was going to testify that appellant did not understand his rights. Additionally, the teacher testified at the suppression hearing and the court and state had that transcript before them at the trial. Hence, the gist of his proposed testimony was evident to the court. As for the proposed testimony of Dionne Almasy, defense counsel advised the court that she would testify that she told appellant to tell the truth. (Tr. 271). As such, we shall consider the merits of this assignment of error.
As aforementioned, the court determines the admissibility or voluntariness of a confession at a hearing outside the presence of the jury. The jury may not later determine that the confession is involuntary. Simms, 385 U.S. at 643; State v. Wigglesworth (1969),18 Ohio St.2d 171, 179. The jury may, however, evaluate the truthfulness and weight to be given to the confession. Id. The defense may present evidence which tends to cast doubt on the credibility of the confession.Crane v. Kentucky (1986), 476 U.S. 683, 689 (stating that the court erred in excluding testimony regarding the psychological impact of the manner and length of the investigation on the sixteen year old defendant). InLoza, 71 Ohio St.3d 61, the Court found no error in a court's exclusion of psychiatric testimony on how the defendant's individual make-up, independent of the circumstances of the investigation, could have impacted the credibility of the confession. Id. at 66 (where the jury could determine the credibility of the confession by viewing the videotape).
Although the jury may determine the credibility of a confession, appellant cites no authority for the proposition that the jury may determine the credibility of a rights waiver; the validity of the waiver was a question for the court alone. From the evidence before us, it appears that the teacher's testimony was only presented to demonstrate appellant's reading and comprehension level and to claim that appellant did not knowingly waive his rights. There is no evidence that the teacher was being presented to show that the police tactics affected appellant in a way that his confession is not credible as was the case in Crane. Further, as stated by the court, the teacher was not alleged to be an expert. See State v. Bailey (1992), 90 Ohio App.3d 58, 71; State v.Wilson (1982), 8 Ohio App.3d 216, 218.
As for the testimony of city prosecutor Dionne Almasy, her testimony appears to be admissible to set the stage for appellant to challenge the reliability of his confessions by setting forth the reasons he allegedly lied. If appellant can testify as to why he made up the confession and that he talked to Dionne Almasy on the telephone, there appears to be no reason why she cannot be called by the defense. Contrary to the state's contentions, testimony is not prohibited at trial where the defendant seeks to diminish the credibility of his confession merely because that testimony was or could have been used at the suppression hearing to determine voluntariness.
Nonetheless, the court's exclusion of her testimony is harmless. Defense counsel proffered that the gist of her testimony would be that she told appellant to tell the truth. Conversely, appellant testified that she told him to do what the police tell him or he will be in prison for a long time without seeing his mother. (Tr. 409). Hence, the exclusion of her testimony, which according to the proffer is not even in appellant's favor as it contradicts his testimony, did not preclude appellant from presenting evidence that his confession is not credible. Accordingly, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER SIX
Appellant's sixth assignment of error contends:
 "THE TRIAL COURT ERRORED [sic] IN FAILING TO PROPERLY INSTRUCT THE JURY WITH REGARDS TO ACCOMPLICE TESTIMONY."
Appellant alleges that Andre Maxwell was an accomplice and thus the court should have instructed the jury as required by R.C. 2923.03(D). Pursuant to the complicity statute, a person acting with the culpability required for the commission of the offense who aids or abets another in committing the offense shall be prosecuted and punished as if he were a principal offender. R.C. 2923.03(A)(2) and (F). This statute also provides that if an alleged accomplice testifies against the defendant, the court shall instruct the jury using a charge substantially similar to the one contained in R.C. 2923.03(D). This charge informs the jury that in considering the testimony of an accomplice, his admitted or claimed complicity may affect his credibility and subject his testimony to grave suspicion and greatly cautious weighing. The charge reminds the jury that it is their province to evaluate the testimony and determine its quality and worth or lack thereof.
The state first points out that Crim.R. 30(A) prohibits a defendant from assigning a failure to instruct the jury unless the defendant objected to the failure, specifically stating the grounds for the objection. A failure to object to a lack of certain jury instructions is waived absent plain, outcome-determinative error. Crim.R. 52(B); Statev. Frazier (1995), 73 Ohio St.3d 323, 339. For the following reasons, the failure to instruct on accomplice testimony in this case does not constitute error, let alone plain error.
In State v. Wickline (1990), 50 Ohio St.3d 114, the Supreme Court determined what constitutes an accomplice for purposes of a provision of former R.C. 2923.03 which required corroboration prior to the admission of accomplice testimony. The Court held that, at the very least, an accomplice must be a person indicted for the crime of complicity. Id. at 118. This district interpreted the indicted accomplice requirement ofWickline as applicable to cases where the defendant seeks a cautionary instruction on the credibility of an accomplice's testimony under R.C.2923.03. State v. Lordi (Oct. 20, 2000), Mahoning App. Nos. 99CA62, 99CA247, unreported, 7. Other districts have similarly held. State v.Gillard (Mar. 3, 2000), Erie App. Nos. E97132, E98038, unreported; Statev, Howard (Aug. 24, 1999), Marion App. No. 9-99-12, unreported; State v.Hinkle (Aug. 23, 1996), Portage App. No. 95P69, unreported.
Andre Maxwell was never indicted for a crime concerning the events surrounding this case. Although an indictment may not be absolutely necessary in every case for a witness to be considered an accomplice and thus an instruction required,[1] there is no evidence that Andre Maxwell was an accomplice. Firstly, he testified that he performed the driving and body-carrying out of fear and not voluntarily, stating that when he refused to move the body, appellant threatened him with a gun. Secondly, even if these acts were done voluntarily, under the circumstances of this case, they would not represent complicity or accomplice liability, but rather, they would make Andre Maxwell an accessory after the fact, the common law crime which now falls under R.C. 2921.32 as obstructing justice. Moreover, appellant's own statement revealed that he had been arguing with both Wesley Moore and Andre Maxwell; appellant expressed fear that "they" would jump him. There was no allegation that Andre Maxwell aided (assisted) or abetted (incited or encouraged) appellant in the actual commission of the murder of Wesley Moore. For these reasons, the court was not required to give a cautionary instruction regarding accomplice testimony. Therefore, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER SEVEN
Appellant's seventh assignment of error alleges:
 "DEFENDANT/APPELLANT WAS DEPRIVED OF A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL."
In order to prevail on a claim of ineffective assistance of counsel, the defendant has the burden to establish two things: (1) that counsel's performance was deficient, and (2) that counsel's deficiency prejudiced the defense. State v. Reynolds (1998), 80 Ohio St.3d 670, 674, citingStrickland v. Washington (1984), 466 U.S. 668, 687. Counsel's performance is deficient if it falls below an objective standard of reasonableness.Id. The defendant must produce evidence that counsel acted unreasonably by substantially violating essential duties owed to the client. State v.Sallie (1998), 81 Ohio St.3d 673, 674. Because attorneys are presumed competent, reviewing courts must refrain from second-guessing strategical, tactical decisions and strongly assume that counsel's performance falls within a wide range of reasonable legal assistance.State v. Carter (1995), 72 Ohio St.3d 545, 558. It is also noted that a defendant is not guaranteed the right to the best or most brilliant counsel. State v. Burley (Aug. 11, 1998), Mahoning App. No. 93CA204, unreported, 3.
Upon demonstrating counsel's deficient performance, the defendant then has the burden to establish prejudice to the defense as a result of counsel's deficiency. Reynolds, 80 Ohio St.3d at 674. The reviewing court looks at the totality of the evidence and decides if there exists a reasonable probability that, were it not for serious errors made, the outcome of the trial would have been different. Strickland,466 U.S. at 695-696. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
Under this assignment of error, appellant sets forth five allegations of ineffective assistance of trial counsel. Appellant's first allegation of ineffective assistance deals with the evidence presented at the suppression hearing. Appellant argues that counsel should have consulted with and procured the testimony of mental health experts regarding his limited mental capacity. He claims that but for this failure, the court would have suppressed his statement by finding that his waiver was not knowingly or intelligently made and his statement was involuntary.
At the suppression hearing, the court heard the testimony of appellant's mother and special education teacher. The teacher opined that appellant could not have knowingly and intelligently waived his rights. The mother testified that appellant has been diagnosed as borderline retarded. She said that appellant often falsely claimed to understand concepts in order to avoid embarrassment. Although the state objected, the court accepted a defense exhibit which was a psychological evaluation performed on appellant in 1993. The psychologist opined that appellant was mildly retarded and that his reading, spelling and math abilities are commensurate with his IQ. The evaluation stated that appellant had poor organizational abilities and is unlikely to learn from his experiences. The court agreed that appellant has a limited mental capacity but ultimately overruled the suppression motion. Thus, the court determined that the waiver of rights was knowing and intelligent and the statement was given voluntarily.
Initially, we note that the failure to present the testimony of a psychologist is not facially deficient. Counsel's decisions on which witnesses to call fall within the province of trial strategy and will not usually constitute ineffective assistance of counsel. State v. Clayton
(1980), 62 Ohio St.2d 45, 49. Hence, it is reasonable to begin with a presumption that the failure to hire a psychological expert was counsel's tactical decision. For instance, psychological opinion may have been that appellant could understand and knowingly waive his rights and that he voluntarily made his statement. There is no evidence that psychological opinion would have been that appellant was too handicapped to understand his rights or make a voluntary statement. See State v. Coleman (1989),45 Ohio St.3d 307, 308-309. Furthermore, the court considered a psychological evaluation over the objection of the state. This evidence was thus presented by the defense without even being subject to cross examination by the state. For the above reasons, deficient performance by counsel is not apparent.
Furthermore, although the trial court subsequently stated that the teacher was not an expert, the suppression court allowed the teacher to testify fully about his opinion on appellant's inability to understand the rights form read to him. The court heard testimony that appellant could barely read, and appellant's mother disclosed that appellant usually hid his inability to comprehend. However, appellant's evidence was contradicted by the state's evidence that appellant did not appear confused about his rights, that he appeared to understand the questions, that he asked sensible questions of his own, that he said he could read and write, that he possessed a temporary driver's permit which can only be gained after passing a written examination, and that the waiver and the statement were both read to him more than once. The court accepted the defense's argument that appellant had a limited mental capacity; however, it still believed that appellant knowingly and intelligently waived his rights and subsequently voluntarily made his statement. Thus, even if defense counsel's failure to present psychological testimony could be considered deficient performance, there is not a reasonable probability that such testimony would have changed the outcome of the suppression hearing. This allegation of ineffective assistance of counsel is without merit.
Appellant's second allegation is that his attorney rendered ineffective assistance by failing to request an instruction on accomplice testimony. Because an instruction on accomplice testimony was unwarranted as analyzed under appellant's sixth assignment of error, this argument fails.
Appellant's third allegation of ineffective assistance of counsel deals with his competency to stand trial. He claims that his attorney should have raised the issue of his competency since he was aware of appellant's limited mental ability. As the state points out, limited mental capacity is totally distinct from incompetency. Incompetency is defined by the inability to understand the nature and objectives of the proceedings or to assist in one's own defense. R.C. 2945.371(G). Appellant's counsel presumably spoke with appellant prior to trial and received no indication that appellant was incompetent. There is no evidence which leads this court to second-guess counsel's decision. In fact, a review of appellant's testimony at trial leads a reasonable person to the conclusion that he was in fact competent to stand trial. This argument is without merit.
Appellant's fourth allegation of ineffective assistance of counsel complains that his attorney failed to file a motion in limine seeking to limit the number and nature of the photographs of the victim, both dead and alive. Counsel need not file a motion in limine to have photographs excluded and may instead merely lodge an objection at trial when the state seeks to submit and later admit the photographs into evidence. Whether counsel rendered ineffective assistance by failing to object is an issue that will be addressed under appellant's eleventh assignment of error where he raises the contention that the photographs prejudiced his defense.
Appellant's fifth allegation is that his attorney rendered ineffective assistance of counsel by failing to object to the state's repeated references during closing arguments to appellant's juvenile adjudication of possessing a stolen handgun. Defense counsel objected to questioning on the juvenile adjudication. (Tr. 451). The court overruled counsel's objection after a hearing in chambers. (Tr. 452-453). Because the court overruled counsel's initial objection to the state's presentation of evidence on appellant's juvenile conviction, there was no reason for counsel to continue objecting each time the state raised the issue. Moreover, it was within counsel's realm of tactical decision-making to choose to avoid interrupting closing arguments to voice an objection which was previously overruled. See State v. Keene (1998),81 Ohio St.3d 646, 668 (stating that a reasonable attorney may decide it best not to interrupt closing arguments with objections). As such, this argument is overruled.
For the foregoing reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER NINE
Appellant's eighth assignment of error, dealing with weight of the evidence, shall be addressed infra at a more appropriate place. Meanwhile, appellant's ninth assignment of error contends:
 "THE STATE OF OHIO DENIED DEFENDANT/APPELLANT HIS RIGHT TO SUBSTANTIVE DUE PROCESS AND A FUNDAMENTALLY FAIR TRIAL BY FAILING TO DISCLOSE EXCULPATORY EVIDENCE TO COUNSEL FOR DEFENDANT/APPELLANT PRIOR TO TRIAL."
According to Brady v. Maryland (1963), 373 U.S. 83, the state must disclose exculpatory evidence to a defendant. The complaining defendant has the burden of proving a Brady violation and a denial of due process.State v. Jackson (1991), 57 Ohio St.3d 29, 33. The evidence alleged to be undisclosed must be material. The mere possibility that an item of undisclosed evidence may have been helpful to the defense is not the test for materiality. Id. The test for materiality is whether it is reasonably probable that, had the evidence been disclosed, the result of the trial would have been different. Id. The material evidence may go toward mitigation, pure exculpation or impeachment. Keene,81 Ohio St.3d at 650.
According to the Ohio Supreme Court, all Brady violation scenarios involve discovery, after trial, of information which was known to the state but unknown to the defense. Wickline, 50 Ohio St.3d at 116, citingUnited States v. Agurs (1976), 427 U.S. 97, 103. Thus, if allegedly exculpatory evidence is presented at trial, there is no Brady violation. See State v. Green (2000), 90 Ohio St.3d 352, 372. In this situation, where the existence of previously undisclosed evidence becomes known at trial, the court may ensure a fair trial by ordering inspection or discovery, granting a continuance or holding an in camera hearing. Id., citing Crim.R. 16(E)(3).
Appellant asserts various instances of the state's alleged failure to disclose exculpatory evidence. He notes that the state's key witness, Andre Maxwell, was in custody for three hours, and the gist of this interview was not revealed to defense counsel. Captain Lynch testified that during this three hours, Andre Maxwell first made a verbal statement incriminating appellant, then physically pointed out the various stops made on the day of the shooting including the site of the body and the crash, and finally, dictated the written statement which was taken down by another officer and read to and signed by Andre Maxwell. (Tr. 333). Nothing exculpatory occurred during those three hours.
Appellant claims that Andre Maxwell gave different stories to police, but only the final statement was revealed to defense counsel. Appellant also contends that both Andre Maxwell and Tom Watson were suspects at one point in the investigation; yet, the state failed to inform defense counsel of the details behind this suspicion.
As the state points out, the record establishes that defense counsel was aware (or during trial, became aware) of the information which appellant now claims was undisclosed. Defense counsel's opening statement provides in part:
 "the police initiated their investigation, and it did lead them to Andre Maxwell. And when they first approached Andre, he gave them several different versions of what occurred. He denied at first being there and then told a couple of other versions and referred them to Tom Watson, said that guy knows; he knows exactly what happened. He implicated Tom Watson in this murder. So the police went to Tom Watson, and Mr. Watson wasn't developmentally handicapped. He knows the system. He didn't want to talk to the police, and he told them right up front. And he didn't talk. So they didn't get the answer they wanted from Mr. Watson, so they went back to Andre Maxwell.
 During the second interview, they interrogated Mr. Maxwell for some three hours. Again, he gave several different versions of what occurred. And each time he talked to police he would adjust his version a little bit because that's what they wanted to hear." (Tr. 149).
Defense counsel then stated that during the final interrogation, Andre Maxwell only stated what police wanted to hear because he was threatened with murder charges. (Tr. 150).
As is evident from the opening statement, the fact that Andre Maxwell's initial and final stories were inconsistent was known to defense counsel prior to trial. Defense counsel knew that Andrew Maxwell originally claimed that he was not present. Andre Maxwell and Captain Lynch both testified that Andre Maxwell was only interviewed twice. Captain Lynch testified that the first set of questions resulted in Andre Maxwell making inconsistent statements about when he last saw Wesley Moore and ended with Andre Maxwell denying any knowledge of the circumstances surrounding his death. Defense counsel knew that Andre Maxwell pointed police to Tom Watson for information at this first questioning. Defense counsel also knew that defense witness, Chris Douglas, had told police that he saw Andre Maxwell in Wesley Moore's car approximately an hour before the time of death. Additionally, Captain Lynch testified that Chris Douglas advised that the victim frequented Tom Watson's house.
The record does not contain the police reports disclosed to the defense in discovery; it only contains evidence that some police reports were disclosed. Because defense counsel knew the above information, there is no indication that the state failed to disclose the information. Even if the state failed to disclose the information, there is no indication that the outcome would have been different had the state disclosed this information to the defense who already knew the information. Even if defense counsel did not know certain information before trial such as the exact inconsistencies in Andre Maxwell's claims of when he last saw the victim, these inconsistencies are not any more impeaching than the fact that he initially denied knowledge and later gave a full statement incriminating appellant. Hence, appellant's arguments that he was denied due process due to nondisclosure of the evidence outlined above are without merit. See, e.g., Wickline, 50 Ohio St.3d at 116 (holding that reversal for a Brady violation does not occur where the information was known to the defense); State v. Grant (Nov. 9, 1990), Mahoning App. No. 83CA144, unreported, 15 (stating that the Brady rule does not apply where the evidence is presented during trial even though the evidence was previously unknown to defense counsel).
Finally, appellant states that the testimony of Chris Douglas was exculpatory, and thus, the state should have disclosed this evidence to defense counsel in discovery. Chris Douglas testified that when Wesley Moore visited his house approximately an hour before the shooting, Andre Maxwell was in the front seat. He also testified that the person in the back seat was husky with wild hair and was not appellant.
Conversely, Captain Lynch testified that Chris Douglas only told them that he could not identify the person in the back seat. This contradicted Chris Douglas's claim that he told police that the person in the back seat was husky with wild hair and was not appellant. As such, there is no indication that the state knew Chris Douglas would give this description. Furthermore, as the state points out, Chris Douglas testified as a defense witness. Appellant presented the very evidence he claims the state withheld. Thus, even if Chris Douglas made a statement to police that was similar to his testimony and even if the state failed to disclose this evidence, appellant's defense was not prejudiced. Hence, this argument is overruled.
 ASSIGNMENT OF ERROR NUMBER TEN
Appellant's tenth assignment of error alleges:
 "DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."
In arguing that certain comments amount to prosecutorial misconduct, appellant must demonstrate that the remarks were improper and that the remarks prejudicially affected his substantial rights. State v. Treesh
(2001), 90 Ohio St.3d 460, 461 (holding that it was not improper for the state to comment during voir dire that the jury must follow instructions and disregard feelings of sympathy). The reviewing court must evaluate the remarks in the context of the entire trial. Id. We focus on the fairness of the trial not the culpability of the prosecutor. State v.Jones (2000), 90 Ohio St.3d 403, 420. Nonetheless, if an objection to the contested remarks is not lodged at trial, all but plain error is waived.State v. Smith (1997), 80 Ohio St.3d 89, 110 (holding that a reference to legal concepts during voir dire is neither prejudicial nor plain error).
Appellant sets forth six allegations of prosecutorial misconduct. First, he complains about the state's questions and references to his juvenile adjudication. One must refer to assignment of error number two where the issue of the juvenile adjudication was addressed. If an adjudication is admissible, then even repeated reference by the state to that adjudication is not prosecutorial misconduct. Regardless, prosecutorial misconduct does not exist where the court specifically allowed the state to question on the juvenile adjudication.
Appellant's second allegation of prosecutorial misconduct deals with the state's recitation of a definition of reasonable doubt. During voir dire, the state told the panel of prospective jurors that it had the burden of proving the defendant guilty beyond a reasonable doubt. (Tr. 31). The state noted that proof beyond all doubt was not required and asked if anyone believed that the state had to prove the defendant guilty beyond all doubt. (Tr. 32). The state then continued:
 "The Judge will instruct you on the definition of reasonable doubt, and it's basically proof of such a character that an ordinary person such as yourself would be willing to rely and act on it in the utmost importance of his affairs, such as a purchase of a home or decision to marry. * * * Does everybody understand the definition of reasonable doubt? Can all of you make a commitment to accept the Judge's instruction and his definition of what reasonable doubt is and hold us to that burden as the State of Ohio? Okay, you promised to hold the State to that burden but nothing less, but also nothing more than that burden, okay?" (Tr. 33-34).
Appellant merely argues that the state substituted its definition of reasonable doubt for the definition to be given in the court's instructions after trial. As the state points out, all but plain error has been waived as defense counsel did not object to the statements presented during voir dire.
Outcome determinative prejudice to appellant's defense is not apparent. In fact, it is reasonable to assume that defense counsel agreed with the above statements and questions posed to the panel. Furthermore, the court instructed the jury on reasonable doubt, and that portion of the court's charge was not dissimilar to the statements made during voir dire. (Tr. 704-705). Even if the state should not have delved so far into the concept of reasonable doubt as instructions are for the court, prejudice to the defense is lacking. Therefore, this argument is without merit.
Appellant's third allegation of prosecutorial misconduct contends that the state improperly misled the prospective jurors by proclaiming that conflicting testimony does not equate with reasonable doubt. The state informed the prospective jurors that it would hear conflicting testimony and asked if they understood that it was their function to make decisions concerning the credibility of witnesses. The state asked if the prospective jurors understood that just because a witness takes that stand and swears to tell the truth does not mean they are telling the truth. (Tr. 34). The state then asked if the panel realized "that the mere existence of conflicting testimony is not reasonable doubt." (Tr. 35). Once again, any issue that exists regarding this statement was waived when defense counsel failed to object. Further, the quoted statement does not appear to be misleading, especially when read in context. It should also be remembered that the jury heard the court's instructions on weighing evidence and credibility. The court also informed the jury that they need not believe a witness merely because he is under oath. (Tr. 707-708). Prejudice is not apparent in this instance. See State v.Campbell (1994), 69 Ohio St.3d 38, 51 (where the Court opined that it was implausible for that defendant to argue that the jury determined a capital case based on a minor legal misstatement made by the state during voir dire). Therefore, this argument lacks merit.
Appellant's fourth allegation of prosecutorial misconduct criticizes the following explanation made by the state at voir dire to a newly seated prospective juror, "She [the prospective juror you replaced] asked to be excused because a good friend of hers was brutally murdered in Mill Creek Park, and she felt she couldn't render a fair and impartial verdict due to that experience." (Tr. 40). As appellant's brief fails to disclose, this statement was only made after the court-excused juror specifically stated in front of the entire pool of prospective jurors that her friend was brutally murdered in Mill Creek Park a couple years ago and that she did not think she could be fair in this trial. (Tr. 37). Then, when her replacement was seated, the court expressly asked him if he could hear everything that was discussed throughout voir dire that morning. The replacement answered affirmatively, but noted that he could not hear a word said by the woman he replaced. This is why the state succinctly repeated the statements made by the excused prospective juror. There is no misconduct in this instance.
Appellant's fifth allegation of prosecutorial misconduct complains, "[the state] basically provided Andre Maxwell with a defense to his involvement in this crime." It appears that appellant takes issue with the following pronouncement made by the state during voir dire, "he participated not in the murder itself, but he did participate, and he'll testify that he helped the defendant take the body over and dump it in the park. And that's not a great thing. Can everyone agree that people can do bad things when under duress?" (Tr. 44). Defense counsel did not object to this statement. The state did not present any misleading information. Andre Maxwell testified and confirmed this introduction. SeeState v. Sneed (1992), 63 Ohio St.3d 3, 16 (noting that merely remarking during voir dire what the evidence at trial would show is not prosecutorial misconduct). As such, prosecutorial misconduct is not apparent in this instance.
Appellant's sixth allegation of prosecutorial misconduct claims that the state misled the jury in its opening statement by noting that appellant's statement to the police "is virtually identical to Andre Maxwell's statement." (Tr. 145). Appellant opines that the two statements "are not nearly identical." However, we disagree.
Both statements say that Wesley Moore, with Andre Maxwell in the car, picked up appellant on the south side of Youngstown, both mentioned stopping at a house on Princeton Street, both talked about riding around, and both mentioned stopping at a house on Brentwood Avenue. Andre Maxwell stated that he was high; appellant stated that they were smoking "blunts." Both statements contain references to an argument occurring before the shooting, and both place Andre Maxwell in the back seat and appellant in the front seat at the time of the shooting. Andre Maxwell said that he saw appellant pull out a chrome gun; appellant said that he pulled out a silver .38 caliber firearm. In both statements, appellant is the shooter. Both statements say that appellant told Andre Maxwell to drive. Both statements say that Andre Maxwell and appellant carried the body into the park. Both statements say that appellant drove away from the park and crashed the car, at which time they split up.
Any differences in the statements are in wording or detail or are minor items, such as Andre Maxwell stating that they crashed into a tree and appellant stating that they crashed into a pole. Accordingly, there was nothing misleading about the state opining that the statements were virtually identical.
Appellant's final allegation of prosecutorial misconduct contends that the state improperly asked Andre Maxwell on redirect if he believed that appellant was capable of shooting him to which Andre Maxwell responded, "If he did it once, he could do it again." (Tr. 211). Initially, we note that defense counsel did not object to this question and answer. In fact, the defense opened the door to this statement when, in cross examining Andre Maxwell, the defense asked in an apparent attempt to establish that Andre Maxwell did not believe appellant would shoot him, "Were you afraid of him when he pointed the gun at you?." (Tr. 198). As such, this argument is without merit. For the foregoing reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER ELEVEN
Appellant's eleventh assignment of error provides:
 "THE TRIAL COURT ERRORED [sic] IN ALLOWING THE INTRODUCTION INTO EVIDENCE OF A PHOTOGRAPH OF THE VICTIM WHILE ALIVE AND ALLOWING INTO EVIDENCE NUMEROUS GRUESOME PHOTOGRAPHS OF THE DECEASED'S DECOMPOSING BODY, THE PROBATIVE VALUE OF WHICH WAS SUBSTANTIALLY OUTWEIGHED BY ITS PREJUDICE TO DEFENDANT/APPELLANT."
Pursuant to Evid.R. 403(A), relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The application of this rule during the evaluation of photographs is left to the sound discretion of the trial court. State v. Lundgren (1995),73 Ohio St.3d 474, 485. Even if the court abuses its discretion in admitting prejudicial photographs, the case is not reversed unless substantial rights of the defendant are affected by the admission. Id. at 486, citing Evid.R. 103 and Crim.R. 52(A). Moreover, when a defendant fails to object to the admission of photographs, he waives all but plain error. Crim.R. 52(B). At this point, we should refer to appellant's fourth allegation of ineffective assistance of counsel set forth in his seventh assignment of error where he claims that counsel rendered prejudicially deficient performance by failing to file a motion in limine
(or lodge an objection) to limit the introduction of photographs.
In reviewing the photographs, it must be remembered that the mere fact that a photograph is gruesome does not render it inadmissible. State v.Maurer (1984), 15 Ohio St.3d 239, 264. Gruesome photographs are admissible if they assist the fact-finder in determining the issues or are illustrative of witness testimony and forensic evidence without causing material prejudice. Id. at 266. See, also, State v. Mason
(1998), 82 Ohio St.3d 144, 158 (noting the admissibility of photographs of the victim's body to illustrate the testimony of the coroner); Statev. Landrum (1990), 53 Ohio St.3d 107, 121 (stating that the admission of a photograph depicting a close-up view of the victim's slit throat is admissible to show cause of death). In State v. Williams (Mar. 20, 2000), Mahoning App. No. 98CA74, unreported, we held that a photograph of a gaping bullet wound to the chest revealing red tissue and measuring six inches long by two inches wide was gruesome but admissible. We pointed out that the photograph illustrated the location of the wound and corroborated the coroner's testimony and other witness testimony about the angle of the shot. Id. at 11-12. See, also, State v. Twyford (Sept. 25, 1998), Jefferson App. No. 93J13, unreported, 32.
Initially, appellant contends that his defense was prejudiced by state's Exhibit Two, a picture of Wesley Moore taken some time before his death. It is hard to fathom how a regular picture of a victim while alive and well is prejudicial. The picture was identified during the direct examination of Andre Maxwell. The state asked if the person in the picture was Wesley Moore. (Tr. 156). This is a perfectly proper way to establish that Andre Maxwell was testifying about the death of the same person for whose death appellant was on trial. Regardless, this photograph was later withdrawn by the state and never admitted into evidence.
Appellant next argues that state's Exhibits Seven through Thirteen were cumulative and prejudicial. These seven photographs depict the body of Wesley Moore laying in the weeds as discovered by police. They were identified during the testimony of Andre Maxwell. (Tr. 179-180). The state asked him if the pictures fairly depict the body as he and appellant left it. (Tr. 181). The defense also asked Andre Maxwell questions about the condition of the body while asking him to review the pictures. One picture, Exhibit Nine, was reviewed by the coroner, and he testified that the photograph depicts the entrance wound but also shows decomposition and tissue damage caused by animals. (Tr. 287). The photograph constituting Exhibit Seven was reviewed by Captain Lynch, and he testified that the picture portrayed what he observed upon approaching the scene. (Tr. 316).
Firstly, Exhibits Seven, Eight and Nine were withdrawn by the state after the presentation of testimony. (Tr. 505). There is no indication that the jury viewed these photographs. As such, the defense was not prejudiced by these exhibits, and we will focus our analysis on Exhibits Ten, Eleven, Twelve and Thirteen which were admitted by the court without objection from defense counsel. (Tr. 505). All four exhibits portray the victim's body lying in a bed of tall weeds. Exhibit Ten is a picture taken from the victim's feet and does not clearly portray the wound or other tissue damage. This photograph is not particularly gruesome and is not prejudicial.
Exhibit Eleven is a picture taken from the victim's left side. Exhibit Twelve is a close up of the victim's head and part of his arm. Exhibit Thirteen is a picture taken from the victim's right side and shows that his left eye appears to be missing or is collapsed from the gunshot wound that entered above his eye. All three of the photographs are gruesome, not merely because of the depiction of the entrance wound and collateral damage but also because of the subsequent tissue damage. For instance, due to some type of carnivore, the victim's ear is missing and a hole can be seen in his head where his ear should be. Additionally, whether due to animals, two days of decomposition or both, the top layer of skin is missing from the left side of his face, the inside of his right arm and the top of his left hand. The resulting appearance is lurid. For example, under a thin layer of translucent skin on the victim's arm, his veins and arteries stand out prominently. As the three photographs are gruesome, we should now evaluate them for probative value and prejudicial effect.
Although the coroner testified that it was hard to notice the entrance wound amid the other tissue damage and Captain Lynch testified that he did not spot an entrance wound when he found the body, each photograph could be argued to be probative as to the cause of death or illustrative of the coroner's testimony. See Landrum, 53 Ohio St.3d at 121. See, also, Treesh, 90 Ohio St.3d at 484. The location of the wound may be probative of intent to kill. Each photograph is illustrative of the testimony of Captain Lynch as it depicts how he found the body. Additionally, each photograph corroborated the statements of Andre Maxwell and appellant as to their disposal of the body and possibly the location of the gunshot wound. Each picture illustrates testimony about blood loss or the lack thereof by showing that no blood was found on the victim's shirt, the victim was wearing a hat, and blood appears on the ground by the victim's head. As such, probative value exists in each individual picture.
Although each of the photographs have been taken from a different angle, presentation of more than one is cumulative as no one picture adds anything of probative value to the next. However, the presentation of cumulative and gruesome photographs where no objection was lodged does not require reversal unless the photographs prejudicially affected appellant's substantial rights and thus were outcome determinative. SeeStrickland, 495 U.S. at 695-696; Lundgren, 73 Ohio St.3d at 485; Crim.R. 52(A) and (B).
By way of example, in State v. Frazier (1991), 61 Ohio St.3d 247, the Ohio Supreme Court found no plain error where two sets of repetitive photographs of bodies were admitted. Id. at 252. In State v. Davis
(1991), 62 Ohio St.3d 326, the Court found that photographs of the same area of the body merely shot from different angles were unnecessarily repetitious but that the overruling of defense counsel's objection did not constitute prejudicial error. Id. at 348. In Campbell,69 Ohio St.3d at 38, the Court found no reversible prejudice where a gruesome photograph was admitted as well as a slide of the photograph. Id. at 50. In State v. Hutton (1990), 53 Ohio St.3d 36, the Court held that four photographs shot at different angles were repetitious but did not require reversal, even where the photographs were "macabre" and depicted "extreme decomposition" of "a rotting corpse." Id. at 48.
Considering that Andre Maxwell testified that he witnessed appellant shoot Wesley Moore and helped dispose of the body and that appellant confessed to the police, it does not appear the jury would not have convicted appellant had it not been able to view the extra photographs. Although the state should present only one probative photograph of a victim's body unless more are necessarily illustrative of the evidence attempted to be established, appellant's rights were not prejudicially or substantially affected. Accordingly, this assignment of error, as well as the relevant portion of appellant's seventh assignment of error dealing with ineffective assistance of counsel, is overruled.
 ASSIGNMENT OF ERROR NUMBER EIGHT
We shall now address appellant's eighth assignment of error, which contends:
 "DEFENDANT/APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
Weight of the evidence concerns the effect of the evidence in inducing belief. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. In order to reverse a verdict as being against the manifest weight of the evidence, a reviewing court must sit as the thirteenth juror and find that the jury clearly lost its way and created a manifest miscarriage of justice. Id. Because credibility of the witnesses and weight of the evidence are the province of the jury, a verdict is reversed on manifest weight grounds only in exceptional circumstances. Id.; State v. DeHass (1967),10 Ohio St.2d 230, 231.
Appellant states his fingerprints were not discovered in the victim's vehicle. He also states that neither blood or gunshot residue was found on his jacket or hands. We note that the tested items were not confiscated until, at the least, two weeks after the murder. Appellant then states that his conviction is against the manifest weight of the evidence due to alleged errors that he previously set forth in his assignments of error. He merely reiterates his prior complaints such as the lack of an accomplice instruction, the failure to suppress his statement, the inability to present evidence on the facts and circumstances surrounding his statement, the reference to a juvenile adjudication and the admission of the gruesome photographs.
Wesley Moore died of a gunshot wound to the head. The jury heard Andre Maxwell testify that appellant fired the fatal shot. The jury heard appellant's confession to the police and then heard him retract his confession on the stand. The jury was in the best position to view the witnesses' demeanor, gestures and voice inflections. We refuse to second guess their determination of credibility and weight of the evidence. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWELVE
Appellant's twelfth assignment of error provides:
 "THE STATE OF OHIO FAILED TO PROVE, BEYOND A REASONABLE DOUBT, THE GUN SPECIFICATION ATTACHED TO THE INDICTMENT."
Incredibly, appellant notes that no firearm was introduced into evidence and concludes that the state presented insufficient proof that an operable gun was used in the commission of the murder. Whether or not the state's evidence is sufficient is a question of law dealing with adequacy. Thompkins, 78 Ohio St.3d at 386. In determining this question of law, we view the evidence in the light most favorable to the state and determine whether any rational fact-finder could find the essential elements proven beyond a reasonable doubt. State v. Goff (1998),82 Ohio St.3d 123, 138. The elements of the firearm specification are having a firearm on or about one's person or under one's control while committing the offense and displaying, brandishing, indicating possession of or facilitating the offense with the firearm. R.C. 2941.145(A).
Under the facts of this case, after finding appellant guilty of murder, a failure to convict on the firearm specification would have been an anomaly. Appellant's statement to police admits that he used a gun to shoot Wesley Moore. Although he later claimed that he did not kill Wesley Moore, there is no dispute that Wesley Moore died of gunshot wound to the head. The coroner so testified. Andre Maxwell so testified. If the jury believed that Wesley Moore died of a gunshot wound, then they necessarily must believe that the offender had a firearm and used it to facilitate the offense. No rational person could disagree that an operable firearm caused the bullet to enter Wesley Moore's head. Thus, the contention, that there is no evidence to support the firearm specification, is without merit.
 ASSIGNMENT OF ERROR NUMBER THIRTEEN
Appellant's thirteenth assignment of error provides:
 "DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE CUMULATIVE EFFECT OF THE TWELVE (12) ERRORS AS SET FORTH HEREIN."
Although a particular error may not cause prejudice by itself, a conviction may be reversed if the cumulative effect of more than one instance of error deprived the defendant of a fair trial. State v.Madrigal (2000), 87 Ohio St.3d 378, 397. We find that neither prejudicial nor cumulative error existed. This assignment of error is overruled.
For the foregoing reasons, the judgment of the trial court is hereby affirmed.
DONOFRIO, J. and WAITE, J., concurs.
[1] See State v. Musgrave (Apr. 24, 2000), Knox App. No. 98CA10, unreported, 8 (determining that a witness was an accomplice even though that witness was not indicted). See, also, State v. Santine (June 26, 1998), Ashtabula App. No. 97A25, unreported, 4 (stating that for purposes of the instruction requirement, an accomplice is one who "could be indicted" and punished for complicity); State v. Church (Apr. 30, 1999), Clark App. No. 98CA36, unreported, 2 (suggesting that the test is whether the record supports a conclusion that the witness was an accomplice).